Reviewed by the Court.

*Decisions will be entered under Rule 50.*

HENRY McK. HASEROT AND BONNIE C. HASEROT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 93774. Filed September 30, 1966.

*John Lansdale, Jr.,* and *Edward J. Hawkins, Jr.,* for the petitioners.
*Gordon B. Cutler,* for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency in petitioners'[1] 1958 Federal income tax of $82,224.86. The principal ground for the deficiency was respondent's claim that cash credited to petitioner, in a transaction involving the transfer of stock for stock and a cash credit, constituted dividend income.

On January 27, 1964, this Court filed its findings of fact and opinion in *Henry McK. Haserot,* 41 T.C. 562 (1964), holding that the cash credit was capital gain and entered its decision therein under Rule 50 on April 8, 1964.

---

[1] Bonnie C. Haserot is a party herein only by virtue of having joined in the joint return. Any subsequent reference to petitioner shall mean Henry McK. Haserot.

Respondent appealed the decision to the U.S. Court of Appeals for the Sixth Circuit, which, on November 3, 1965, remanded the case to this Court for a determination as to whether the transaction involved herein was "essentially equivalent to a dividend" within the meaning of sections 302(b)(1) and 301(a).[2] In its order, *Commissioner* v. *Haserot*, 355 F. 2d 200 (C.A. 6, 1965), the Court of Appeals stated:

The Tax Court did not determine if the redemption was here equivalent to a dividend * * *

\* \* \* \* \* \* \*

It appears to this Court, upon review, that a determination of the issue of equivalency might indeed be dispositive of the thrust of petitioner's argument on the Section 304 application to the transaction herein and that such a determination should be made. * * * As such, it should be decided initially by the Tax Court.

This matter is hereby remanded to the Tax Court for further proceedings in accordance with the views expressed in this order. [355 F. 2d at 201.]

On December 7, 1965, this Court vacated the decision in *Henry McK. Haserot*, *supra*. Thereafter, on January 4, 1966, petitioner filed a motion to revive that decision.[3]

FINDINGS OF FACT

The Findings of Fact in *Henry McK. Haserot*, *supra*, are incorporated by reference and are made findings of fact herein.

The $64,850 cash credit received by petitioner in 1958 constituted a distribution essentially equivalent to a dividend.

OPINION

The critical issue for our present consideration is whether the cash credited to petitioner was essentially equivalent to a dividend within the meaning of sections 302(b)(1) and 301(a). The parties agree that a finding of no dividend equivalency would be dispositive of the case.

The colors of the cloth of dividend equivalency are not completely fast. Indeed, the fabric "bleeds," madras-like, to such an extent that the decided cases have been described as a "morass" (see *Ballenger* v. *United States*, 301 F. 2d 192, 196 (C.A. 4, 1962)) and the underlying statutory provisions referred to as "exasperatingly complex" (see *Charles Swan*, 42 T.C. 291, 297 (1964), affd. 355 F. 2d 795 (C.A. 6, 1966)). Under such circumstances, we believe it would be a sterile exercise to indulge in an analysis of all the factors involved and the weight to be given to each factor.

---

[2] All references are to the Internal Revenue Code of 1954, unless otherwise specified.

[3] Due to the resignation of Judge Russell E. Train, who heard the evidence and rendered the decision in *Henry McK. Haserot*, the case was assigned on remand to Judge Theodore Tannenwald, Jr.

The legislative history of section 302(b)(1) indicates that it is to be interpreted "in general" in the same manner as section 115(g) of the Internal Revenue Code of 1939 and that the inquiry is to be "factual." S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 233–234 (1954).

There are two main prongs to petitioner's argument that the transaction was not essentially equivalent to a dividend within the meaning of section 302(b)(1).[4] He asserts (a) it produced a substantial change of control at the shareholder level and (b) it was motivated by and achieved a corporate business purpose.[5]

Respondent answers that there was no meaningful shift of stock ownership as a result of the transaction, that there was no valid corporate business purpose for the transaction, and that therefore its net effect was a dividend.

Before the transactions, the ownership of the corporations was as follows:

*Northport* (4,562 shares) : Petitioner, 1,999; Gypsum, 1,312; Company, 1,250; others, 1.

*Gypsum* (6,582 shares) : Petitioner, 4,486; Company, 2,022; others, 74.

*Company*[1] (33,014 shares) : Petitioner, 18,895; petitioner's son, 1,023; estate of petitioner's father, 10,293; others, 2,803.

---

[1] The Haserot Co.

After the transactions, the ownership was as follows:

*Northport* (4,562 shares) : Company, 3,249; Gypsum, 1,312; others, 1.

*Gypsum* (6,582 shares) : Company, 6,508; others, 74.

*Company* (35,446 shares) : Petitioner, 29,188; petitioner's son, 3,455; others, 2,803.

If we look only to the shares registered in petitioner's name, his percentage of control is as follows:

| | Northport percent | Gypsum percent | Company percent |
| --- | --- | --- | --- |
| Before | 43.8 | 68.2 | 57.2 |
| After | 0 | 0 | 82.3 |

However, the Company owned shares in both Gypsum and Northport. A majority of the issued and outstanding shares of the Company were registered in petitioner's name and he therefore could dictate actions to be taken by Company with respect to its Northport and Gypsum shares. As a result, petitioner had effective control of a majority of the shares of all three corporations, as revealed by the following table:

| | Northport percent | Gypsum percent | Company percent |
| --- | --- | --- | --- |
| Before | 99.9 | 98.9 | 57.2 |
| After | 99.9 | 98.9 | 82.3 |

---

[4] Petitioner does not contend that the transaction meets the requirements of paragraph (2) or (3) of subsec. (b).

[5] As to other arguments advanced by petitioner, see pp. 869–871, *infra*.

Finally, if we apply the attribution rules of section 318,[6] the following pattern of petitioner's control appears:

| | Company percent | Gypsum percent | Northport percent |
|---|---|---|---|
| Before | 91.5 | 96.3 | 96.6 |
| After | 92.1 | 91.1 | 91.8 |

Parenthetically, we note that petitioner disputes the attribution to him of the shares acquired from his father's estate and the shares issued to his son. He supports his position by the general assertion that "This has the anomalous result of using stock acquired with cash to make the cash itself look more like a dividend." Additionally, petitioner argues that attributing ownership of Northport and Gypsum to him through his ownership of Company shares after the transaction is "unreal." In support of his contentions he relies upon *Estate of Arthur H. Squier*, 35 T.C. 950 (1961), acq. 1961–2 C.B. 5. The opinion in that case did contain some indication that the attribution rules would not be applied inflexibly in determining whether a redemption is essentially equivalent to a dividend. But the Court made clear that it reached the same result even after applying the attribution rules of section 318. See 35 T.C. at 955. Moreover, the Court emphasized that the redemption therein "in fact resulted in a crucial reduction of the estate's *control* over the corporation."[7] See 35 T.C. at 955–956. If we look at the reality of control herein, it is obvious that, with or without the application of the attribution rules, petitioner was at all times in a position to dominate all three corporations.

Petitioner further seeks to avoid the impact of his continuing dominant position by asserting that the transaction herein was merely a step in a plan to transfer control of the corporate complex to his son. Whatever may be the merits of this assertion in another context, it has no relevance to the instant case. The only actual change in the formal management occurred in 1960 when petitioner's son became

[6] Under the will of petitioner's father, petitioner had the choice of (a) receiving all the Company shares bequeathed to him on payment to the estate of an amount equal to certain taxes for which the estate was liable or (b) not paying the amount mentioned in (a) and receiving all of the shares *less* the number of such shares the value of which equaled such taxes. Although petitioner might not be considered a "beneficiary" of the estate for the purposes of sec. 318(a)(2)(A) with regard to the number of shares the value of which equaled the taxes, see sec. 1.318–3(a), Income Tax Regs., and sec. 643(c), he would be treated as having an option to acquire same, and ownership thereof would be attributed to him pursuant to sec. 318(a)(3). See *Winthrop M. Crane III*, 45 T.C. 397 (1966), on appeal (C.A. 1, June 30, 1966).

[7] The taxpayer's direct ownership dropped from slightly over a majority (50.09 percent) to substantially less than a majority (41.27 percent). Under such circumstances the cleavage between the father's executors and members of the family which in fact existed in that case became a meaningful impediment to taxpayer's control. We note that there is no such claim of cleavage herein. The same situation existed in *Herbert O. Parker*, T.C. Memo. 1961–176, also relied upon by petitioner, where there was a cleavage between a father and son and where the taxpayer and his wife owned 50.3 percent of the shares before and 28.7 percent after the redemption. See also pp. 870–871, *infra*.

president of the three corporations. Petitioner, in his testimony, adverted to a plan for transferring the shares he owned at his death in such a manner that his son would have majority control. Needless to say, any such plan was at all times subject to change until petitioner died and therefore may properly be disregarded. *Friend* v. *United States,* 345 F. 2d 761 (C.A. 1, 1965); see *Neff* v. *United States,* 305 F. 2d 455, 458 (Ct. Cl. 1962).

To confine ourselves to petitioner's limited view of the situation would be to exalt illusion over reality. We hold that under all the circumstances of this case there has not been that "meaningful change" in petitioner's shareholder position which is the "indispensable first step" to a finding of lack of dividend equivalence. *Bradbury* v. *Commissioner,* 298 F. 2d 111 (C.A. 1, 1962), affirming a Memorandum Opinion of this Court; *Leon R. Meyer,* 46 T.C. 65 (1966), on appeal (C.A. 8, June 15, 1966); *Ralph L. Humphrey,* 39 T.C. 199 (1962).[8]

We turn to the second main prong of petitioner's position, namely, that the transaction herein was clothed with a corporate business purpose.[9] We recognize that such a purpose may, under certain circumstances, constitute a "conspicuous countervailing consideration" sufficient "to dispel the aura of dividend equivalence." See *Bradbury* v. *Commissioner, supra* at 117. But it is equally true that such a purpose does not per se establish nonequivalence. See *Neff* v. *United States, supra* at 457; *Charles Swan, supra* at 299.

Petitioner contends that the transaction herein had as its objectives assurance of Company control over Northport and Gypsum and preservation of Company stock ownership in active Company management. Petitioner's witnesses testified that, when petitioner's father was an active participant in the business, he did not attempt to take charge of Company's operation but did, on occasion, personally take charge of the operation of Northport and Gypsum and that this was inimical to the best interests of the corporate complex. Petitioner further suggests that there was a possibility that he might, in his later years, acquire the vices of his father in this regard. The superficiality of petitioner's blandishments are starkly revealed by the facts herein. Assuming that petitioner might have become a "chip off the old block," the record indicates that the operating difficulties allegedly created by petitioner's father occurred during the period when there was a lack of common control over the three corporations. During the period 1942 to 1951, petitioner was the president and controlling

---

[8] For a discussion of petitioner's reliance on cases which held that a small percentage shift in ownership was sufficient to preclude a finding of dividend equivalence, see pp. 870–871, *infra.*

[9] We see no need to delve into the intricacies of corporate versus shareholder business purpose in applying sec. 302(b)(1), an issue which unfortunately the decided cases have often elaborated but rarely clarified.

shareholder of the Company and petitioner's father was the president and controlling shareholder of Northport and Gypsum. In 1951, the essential common control was created by the resignation of petitioner's father as president of Northport and Gypsum and the transfer of his shares in those two corporations to petitioner. From and after that time, the possibility of divisive activity would seem to have disappeared. Even if we ignore (as petitioner does) the leverage of the Company over Northport and Gypsum, arising from the Company's position as a substantial and the principal creditor, common ownership by petitioner of all three corporations assured *unity of success or of failure* of operations. The 1958 transaction neither enhanced nor lessened this possibility. Indeed, if petitioner's position is sound regarding the consequence of a change from a brother-sister to a parent-subsidiary relationship, a valid business purpose could be imported into every section 304 transaction involving interrelated business operations. We doubt that Congress intended to provide such an extensive safe harbor in enacting that section.

Nor are we impressed by petitioner's assertion that the requisite business purpose existed in the alleged goal of preserving ownership of the Company in active management. Such an assertion ignores the cardinal fact that management of a corporation is in the final analysis at the mercy of the shareholders. Even assuming that it was in the best interests of the Company for the majority interest to be retained in petitioner's son or others active in its management, the instant transaction did not accomplish this objective. Petitioner could have transferred a controlling interest in the Company *inter vivos* or at death to persons outside this circle. Such a transfer would have resulted in the *complete* loss of control by management over the Company *and* Northport and Gypsum.[10] Under the circumstances, we cannot say that acquisition by the Company of the Northport and Gypsum shares and "assisting" petitioner to acquire the Company shares owned by the estate of petitioner's father constituted a sufficient "conspicuous countervailing consideration." See *Bradbury* v. *Commissioner, supra* at 117.

Petitioner also seeks to sustain his position by arguing that the transaction herein was in effect only a step in the acquisition by the Company of the shares held by the estate of petitioner's father and that petitioner had more money in corporate solution after the transaction than he had prior thereto. Both of these arguments miss the mark.

---

[10] We have made a finding that there was some kind of an agreement requiring a holder to sell his stock if he left the Company for any reason. But we were not enlightened as to the details of the agreement or the extent to which it was applicable to petitioner. In any event, the record shows that some transfers were permissible because petitioner testified that his will contained provisions for a trust of his shares.

The fact is that the Company did not acquire any of the shares from the estate of petitioner's father—either directly or indirectly. The petitioner acquired *and retained* the additional shares, which remained available to him for his use. Nor is it necessarily true that petitioner had more money in corporate solution as a result of the transaction. In support of this position, petitioner limits himself to the cash flow in the 1958 transaction and arrives at an alleged additional cash investment by petitioner of $16,134.28, the difference between the cash credit of $64,850 and the aggregate of $80,984.28 paid for the estate's shares. Petitioner conveniently ignores the facts that in 1956 he had received from the Company and paid to the estate $27,000 against the $80,984.28 and that he had a running account with the Company which reflected other items of advances and repayments. Moreover, immediately after the transaction herein, petitioner's account with the Company showed a *credit* balance of $13,958.95. To this extent, his additional investment was in the form of an indebtedness to him rather than a capital investment. Even if we assume that petitioner might find salvation if he in fact had more invested in the corporate solution, we cannot say that petitioner has met the threshold condition. Cf. *William K. Edmister*, 46 T.C. 651 (1966).

The case of *John A. Decker*, 32 T.C. 326 (1959), affirmed per curiam 286 F. 2d 427 (C.A. 6, 1960), heavily relied upon by petitioner, is distinguishable. In that case, although the shares were initially acquired by the remaining shareholders, they were *immediately transferred by them to the corporation*. Thus, it was possible to treat the purchasing shareholders as mere agents for the corporation. See *Edgar S. Idol*, 38 T.C. 444, 460 (1962), affd. 319 F. 2d 647 (C.A. 8, 1963). Furthermore, there was a modicum of business purpose in that it appears that the corporation acquired the shares for resale, and in fact did resell some of the shares, to their employees. Compare *Fred B. Snite*, 10 T.C. 523 (1948), affd. 177 F. 2d 819 (C.A. 7, 1949), with *Neff* v. *United States, supra*. Finally, there was a real shift in effective control in *Decker*. Prior to the transaction therein, majority action required the agreement of *three* of the five equal shareholders; after the transaction a majority could be achieved by a combination of *two* of the remaining three principal shareholders plus the holder of one share from the minority group. Thus, the veto power of each of the three principal shareholders was significantly lessened. Indeed, this distinction indicates the fundamental weakness of petitioner's position on the issue of dividend equivalence. Petitioner has made a computer-like analysis of the cases to show that the courts have held that there was no dividend equivalence even where there was a very small percentage shift in ownership. In so doing, petitioner has overlooked the fact that, although the percentage shift was small, the effect of the shift

was critical. For example, as we have already pointed out (see fn. 7, *supra*), in *Estate of Arthur H. Squier, supra,* heavily relied upon by petitioner, actual ownership of the stock by the taxpayer only dropped from 50.09 percent to 41.27 percent but in fact the change was from majority to minority control. A similar analysis distinguishes *Sorem* v. *Commissioner,* 334 F. 2d 275 (C.A. 10, 1964), reversing 40 T.C. 206 (1963), where the taxpayer's 50-percent *direct* ownership (and a concomitant negative control) was replaced by an indirect ownership of only 37.91 percent reflected in the ownership, *counting attributed shares,* of the stock in the parent corporation. Clearly it was no longer possible for the taxpayer to block corporate action at either parent or subsidiary level. Such a situation is a far cry from petitioner's position herein where he increased rather than decreased his percentage of ownership of the Company (which after the transaction had overwhelming control of Northport and Gypsum) and at all times had majority control by a wide margin. Cf. *William K. Edmister, supra;* see *Wiseman* v. *United States,* 259 F. Supp. 90 (D. Maine 1966); *Charles Swan, supra* at 298.

Petitioner also emphasizes the nontax pristine purity of the motivations for the transactions involved herein. But, at best, the absence of a tax-avoidance motive has long since been relegated to a subsidiary ingredient in the potion of dividend equivalence. *Kerr* v. *Commissioner,* 326 F. 2d 225 (C.A. 9, 1964), affirming 38 T.C. 723 (1962), certiorari denied 377 U.S. 963; cf. *William K. Edmister, supra;* see 1 Mertens, Law of Federal Income Taxation, sec. 9.100.

Finally, we are unimpressed by petitioner's contention that the transaction herein could have been conducted in a manner unobjectionable to respondent and tax-free to petitioner. It may well be that the same result could have been achieved by a combination of redemption by the Company of some of the shares held by the estate of petitioner's father, direct acquisition of the remaining shares by petitioner for a smaller cash payment, and an exchange of petitioner's Northport and Gypsum shares solely for Company shares. Cf. *Zenz* v. *Quinlivan,* 213 F. 2d 914 (C.A. 6, 1954). But the fact of the matter is that the form and substance of the transaction herein coincided and petitioner does not contend otherwise. That a result may have different tax consequences, if brought about in another way, does not mean that the actual transaction may be disregarded. *United States* v. *Collins,* 300 F. 2d 821, 825 (C.A. 1, 1962); *Wiseman* v. *United States, supra.*

On all the facts and circumstances of this case, we hold that the distribution of $64,850 to petitioner by the Company in 1958 was essentially equivalent to a dividend within the meaning of section

302(b)(1).[11] Although the majority recognizes that this Court may have the power to review its prior decision herein and that there may be significant doubts as to its correctness (the writer's separate views on this score are appended hereto), they nevertheless are constrained to confine themselves to the specific question raised by the remand. Consequently, subject to our finding as to dividend equivalence, petitioners' motion to revive our prior decision, in accordance with the prior Rule 50 computation, is granted.

Reviewed by the Court.

> *Decision will be entered that there is a deficiency of $90 in petitioners' income tax for the taxable year 1958.*

TANNENWALD, J., speaking separately. I do not share the reluctance of my colleagues to reconsider the question whether the fact that the transaction falls within the literal language of section 351 operates to preclude the application of section 304(a). There is no doubt that we have the power so to do, since the Court of Appeals neither expressly nor by implication ruled on this issue. *Commissioner* v. *Lincoln Electric Co.*, 176 F. 2d 815 (C.A. 6, 1949), certiorari denied 338 U.S. 949 (1950); see *Gunn* v. *United States*, 283 F. 2d 358, 361 (C.A. 8, 1960).

The applicable provisions of the Code are set forth in the margin.[1] In reexamining our prior position, I would adopt the Supreme Court's

---

[11] For an excellent analysis of recent cases dealing with the issue of dividend equivalency, see Moore, "Dividend Equivalency—Taxation of Distributions in Redemption of Stock," 19 Tax L. Rev. 249 (1964).

[1] SEC. 304. REDEMPTION THROUGH USE OF RELATED CORPORATIONS.

(a) TREATMENT OF CERTAIN STOCK PURCHASES.—

(1) ACQUISITION BY RELATED CORPORATION (OTHER THAN SUBSIDIARY).—For purposes of sections 302 and 303, if—

\* \* \* \* \* \* \*

(B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control,

then (unless paragraph (2) applies) such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. In any such case, the stock so acquired shall be treated as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation.

SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. \* \* \*

(b) RECEIPT OF PROPERTY.—If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then—

(1) gain (if any) to such recipient shall be recognized, but not in excess of—

(A) the amount of money received, plus

(B) the fair market value of such other property received; \* \* \*

SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(d) REDEMPTIONS TREATED AS DISTRIBUTIONS OF PROPERTY.—*Except as otherwise provided in this subchapter,* if a corporation redeems its stock (within the meaning of sec-

admonition in *Helvering* v. *Hallock*, 309 U.S. 106 (1940), and conclude that we can and should reject the "doctrine of disability at self-correction." [2]

Petitioner applies a double-barreled syllogism to reach the conclusion that section 351 applies as follows:

(a) Section 304 applies only to "sales" and not "exchanges." Moreover, if stock is acquired for property, section 304 is literally inapplicable since, under section 317(a), stock of Company is not "property." Consequently, section 351 alone controls.

(b) Even if section 317 is not operative to preclude the applicability of section 304, the transaction fits literally within both section 304 and section 351. The energizing force for section 304 is section 302. Section 302(d) provides that, "Except as otherwise provided in this subchapter" (subch. C), a redemption not falling within section 302(a) will be characterized for tax purposes under section 301. In view of the presence of the "except" clause in section 302(d) and the absence of similar language in section 351, Congress intended that section 351 control. Moreover, section 301(a) has a similar "except" clause and this is further recognition that other sections may limit what might otherwise be characterized as dividends.

Respondent vigorously contests the logic of this syllogism, arguing that section 317 does not prevent the characterization of the instant transaction as a redemption; that section 351 applies only to exchanges; that section 351 is not one of the Code sections referred to in the "except" clauses; and that the detailed specificity of section 304 must therefore control.[3] Finally, respondent asserts, with obvious anguish, that petitioner's reasoning would result in section 304 controlling transactions where the shareholder owned more than 50 percent but less than 80 percent of the two corporations and section 351 controlling transactions where he owned 80 percent or more, thereby creating an absurd construction of the statute—a situation which the

---

tion 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies. [Emphasis added.] SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—*Except as otherwise provided in this chapter*, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). [Emphasis added.]

[2] In the course of his reexamination, the writer had the benefit of the briefs filed by the parties with the Court of Appeals as well as those filed with this Court in the prior proceeding. The commentators' views on our original decision vary widely. Two writers felt that we reached the correct result as a matter of statutory construction: Warren and Anthoine, 1964 CCH Fed. Tax Current L. and Practice 975; 64 Col. L. Rev. 1156 (1964). One felt our decision "could make a dead letter of section 304": Bittker, Federal Income Taxation of Corporations and Shareholders 26 (1964 supp.). And a fourth concluded that the original decision was incorrect: Kempf, "Disguised Dividends in Related Corporation Transactions," 33 U. Chi. L. Rev. 66–74 (1965).

[3] Respondent concedes that if sec. 351 is found to be applicable, capital gains treatment is proper. Compare sec. 1.351–2(d), Income Tax Regs.

Supreme Court has abjured. See *Holy Trinity Church* v. *United States*, 143 U.S. 457, 459 (1892).

As is usually the case, the path to be followed is not as clearcut as either petitioner or respondent would have us believe. The statutory provisions and legislative history reflect a certain ambiguity, if not outright inconsistency. But the magnitude of the challenge cannot justify a failure of response. As was stated by Lord Justice Denning in *Seaford Court Estates Ltd.* v. *Asher*, [1949] 2 K.B. 481, 499:

> It would certainly save the judges trouble if Acts of Parliament were drafted with divine prescience and perfect clarity. In the absence of it, when a defect appears, a judge cannot simply fold his hands and blame the draftsman. He must set to work on the constructive task of finding the intention of Parliament * * *. Put into homely metaphor it is this: A judge should ask himself the question: If the makers of the Act had themselves come across this ruck in the texture of it, how would they have straightened it out? He must then do as they would have done. A judge must not alter the material of which it is woven, but he can and should iron out the creases.

Petitioner's assertion that section 304 applies only to "sales," and that the instant transaction is an "exchange" and not a "sale," is fallacious. It is true that the Congressional committee reports dealing with section 304 speak in terms of "sales" without quotation marks. See H. Rept. No. 1337, 83d Cong., 2d Sess., p. A 79 (1954); S. Rept. No. 1622, 83d Cong., 2d Sess., p. 239 (1954). But the word "acquisition" is used in the section itself and in other sections of the Code where clearly it encompasses a broader spectrum of transactions than "sales." Cf., e.g., secs. 269 and 357. And it is not without significance that when Congress first dealt with the category of loophole involved herein, i.e., the acquisition by a subsidiary of shares in a parent corporation, its characterization of such transactions as sales was set off with quotation marks. See H. Rept. No. 2319, 81st Cong., 2d Sess., p. 53 (1950).

Petitioner's further contention as to the impact of section 317 (a) on section 304 (a) (1) (B) also does not stand up. First, if Congress had intended that section 304 (a) apply only if the acquisition was "solely" for property as defined by section 317 (a), it could have easily inserted the term in the former section, as it did in sections 354 (a) (1), 355 (a) (1) (A), and 368 (a) (1) (B) and (C). Second, it seems clear that the purpose of section 317 (a) was to avoid treating as a distribution under sections 301 (a) and 302 (d) the value of stock distributed by the acquiring corporation, a result which would otherwise have been required under the language of those sections.

It could be argued with equal or greater logic that, by virtue of section 317 (a), the stock of the acquiring corporation (the Company herein) should be disregarded with the result that petitioner should be viewed for the purposes of section 304 as having received only a cash credit. Such a reading of the statute would obviously make the trans-

action herein a simple sale of the Northport and Gypsum shares, thereby precluding any possibility of applying section 351 and clearly requiring taxability of the cash credit as a dividend by virtue of the interplay of sections 304(a)(1), 302(d), and 301(a).

In view of the foregoing, I am unwilling to engage in such obvious subversion of section 304(a)(1) by reading the word "solely" into the statutory mandate.[4]

I turn now to petitioner's assertion that, because of the phrase "except as otherwise provided" in sections 302(d) and 301(a), the instant case is controlled by section 351 rather than section 304.

The legislative history of subchapter C blurs rather than illumines the problem. Section 351 of the House version of H.R. 8300 (which in final form became the Internal Revenue Code of 1954) contained a cross reference which made it plain that cash distributions in a transaction of the type involved herein could be characterized as a dividend under section 301. Neither section 301 nor section 302 contained any "except" clauses. Under the House bill, therefore, section 301 was intended to have basket coverage. See H. Rept. No. 1337, 83d Cong., 2d Sess., pp. 39, A 70 (1954). Had these provisions been finally enacted, the answer to the problem in the instant case would have been clear.

In the Senate, the provisions relating to corporate distributions were substantially recast. In so doing, the Senate evinced a desire to adopt a "less extreme approach." It was concerned that the House had used "few of the terms or concepts with which the courts * * * have become familiar over the years" and sought "to preserve the terms and concepts of existing law wherever possible." The Senate emphasized, however, that it had "not hesitated to depart from the present statute, where such departure was necessary in order to * * * preclude the use of avoidance devices which have proved successful under the existing code." See S. Rept. No. 1622, 83d Cong., 2d Sess., p. 42 (1954). It was within this context that the "except" clauses were included in sections 302(d) and 301(a).

Against this background, petitioner argues that Congress used the words "subchapter" and "chapter" in sections 302(d) and 301(a) in

---

[4] Nor does the existence of certain lacunae in the statutory provisions as to the treatment of the acquiring corporation's stock require a different conclusion. It is true that, unlike other sections of the Code, notably secs. 354(a)(1), 355(a)(1)(A), and 356, sec. 304 does not contain any cross-reference to a section governing the treatment of the acquiring corporation's stock. Reading secs. 304(a)(1), 305(a), 307(a), and 317(a) together, it would appear that the Company would treat the Northport and Gypsum stock as a contribution to its capital, governed by sec. 362(a)(2), the distribution of Company stock to petitioner would be rendered nontaxable by sec. 305(a), and the basis of his Company stock would be determined under sec. 307(a). Since a transaction to which sec. 304 is applicable and which fails to meet the tests of sec. 302(b) is not treated as an exchange of stock under sec. 301(a), it follows that the transferee's stock would be treated as received in a distribution rather than an exchange and sec. 305(a) would, on its face, apply.

their literal senses and meant to except a transaction falling *literally* within *any* other section of the subchapter and chapter. His argument derives inferential support from the fact that Congress showed elsewhere in the 1954 Code that it knew how to refer specifically in other clauses to (a) "subsections" (secs. 357(a), 305(a), and 311(a)); (b) "sections" (secs. 336 and 312(a)); (c) "paragraphs" (sec. 302(c) (1)); (d) "subtitles" (sec. 316(a)); (e) "parts" (sec. 317(a)); and (f) "subchapters" (sec. 354(c)). I think, however, that petitioner's literal reading of the statute imputes a dragnet exclusion from dividend equivalence of types of distributions which Congress intended to be included. As has been pointed out, the Senate made it clear that, although its rewrite of the House version of H.R. 8300 was occasioned principally by a desire to preserve "terms and concepts of existing law," such rewrite was still directed at "the use of avoidance devices which have proved successful under the existing Code." See S. Rept. No. 1622, *supra*. The transfer of stock of brother-sister corporations was precisely such a device. See S. Rept. No. 1622, *supra* at 45–46, 239.

If petitioner's view were adopted, it would to a large degree negate the long-standing efforts to deal legislatively with problems of the type involved herein. Commencing in 1950, when the predecessor of section 304 was enacted to control redemptions by a subsidiary from a parent (sec. 208 of the Revenue Act of 1950, which added sec. 115(g) to the Internal Revenue Act of 1939), Congress has shown concern for the possibilities of mischief arising from dealings between related corporations and their controlling shareholders in such corporations' stock. See H. Rept. No. 2319, *supra;* S. Rept. No. 2375, 81st Cong., 2d Sess., p. 81 (1950). In 1954, in order to minimize further the possibilities of mischief, it enacted section 304, which requires "brother-sister" participants to walk the tightrope of section 302(b) in order to qualify for capital gains treatment when the same person or persons control 50 percent of each corporation.

Petitioner would have us modify the requirement of control from "fifty percent" to "fifty percent *but less than eighty percent.*" Such a result would enable an 80-percent-or-more shareholder to play fast and loose with section 304 to a degree not permitted to the holder of a lesser percentage but nevertheless majority control. The instant situation is not comparable, as petitioner suggests, to those where one receives favorable or unfavorable treatment because he owns less than a *statutorily specified* percentage of the outstanding stock, as, for example, in sections 318 and 368, as well as in sections 304 and 351. In each of those sections, Congress has consciously, for policy reasons, established a self-contained mathematical trigger to provide taxpayers with some certainty in the planning of their affairs.

If Congress had specifically provided that section 351 did not apply where the transferor owned 79 percent but did apply where he owned 20 percent or that section 304(a)(1) did not apply where common control was 49 percent but did apply where it was 10 percent, we would be bound by such limits, however bizarre we might judge them to be. But it does not follow that we should *infer* such an eccentric choice for the purpose of providing a safe harbor under section 304 in situations where there is an 80 percent or more, as well as less than 50-percent ownership.

The paradox of petitioner's position is dramatized if one considers the interrelationship between section 301, on the one hand, and section 1002 [5] on the other. If the "except" clause in the former requires us to look at other sections, the "except" clause of the latter requires us to do the same.[6] The task of disposing of the renvoi problem thus presented is second only to that of squaring the circle. Moreover, under petitioner's interpretation, section 351 would control even where only a peppercorn of stock is issued by the acquiring corporation. Perhaps petitioner is correct when he suggests that such a result could be obviated by treating the transaction as "sham." But I see no need to expand the fertile field of argument as to what transactions are "real" or "sham," if such a course can be avoided.

Unquestionably, Congress has the power to legislate eccentrically, but I am loath to find that it has exercised this power where a reasonable basis for synthesis exists. See *J. C. Penney Co.* v. *Commissioner*, 312 F. 2d 65, 68 (C.A. 2, 1962), affirming 37 T.C. 1013.[7]

Doubtless the statute would have been clearer if Congress had directly connected the "except" clauses by placing them immediately after the phrases "such redemption" and "a distribution." Nevertheless, I believe that the "except" clauses of sections 302(d) and 301(a) relate to the terms "redemption" and "distribution" in the respective

---

[5] SEC. 1002. RECOGNITION OF GAIN OR LOSS.

Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized.

[6] The word "subtitle" in sec. 1002 refers to all the provisions dealing with income taxes and includes all chapters and subchapters.

[7] Even from the point of view of literal interpretation, the opposite result from that advanced by petitioner can be reached. Sec. 304(a)(1) specifically provides:

*For purposes of section 302 and 303 * * * [the property received] * * *

*shall be treated as a distribution in redemption* of the stock of the corporation acquiring such stock. In any such case, the stock so acquired *shall be treated* as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, *as a contribution to the capital of such corporation.* [Emphasis added.]

From the use of the mandatory phrase "shall be treated," it might logically be concluded that Congress had mandated that sec. 304 transactions be treated as redemptions and has therefore "otherwise provided." Under such an interpretation, resort to sec. 351 is precluded or, at most, we are left with a transaction that literally falls within two coordinate sections. In the latter case, we have no hesitancy in holding that sec. 304 controls. Cf. *Bazley* v. *Commissioner*, 331 U.S. 737 (1947); *Helvering* v. *Cement Investors, Inc.*, 316 U.S. 527 (1942); *Rooney* v. *United States*, 305 F. 2d 681 (C.A. 9, 1962); *National Securities Corp.* v. *Commissioner*, 137 F. 2d 600 (C.A. 3, 1943), affirming 46 B.T.A. 562 (1942), certiorari denied 320 U.S. 794.

subsections and are therefore limited to the provisions dealing with such situations. Such reasoning allows the permissiveness of section 351 to yield to the preventive policy of section 304. See Kempf, "Disguised Dividends in Related Corporation Transactions," 33 U. Chi. L. Rev. 94 (1965). It best achieves the underlying legislative intent and policy and, in my opinion, more nearly reflects the manner in which Congress would have "straightened this ruck out if they had come across it." [8] See *Seaford Court Estates Ltd.* v. *Asher, supra.*

I would therefore hold that section 304(a)(1) controls.

SIMPSON, *J.*, agrees with this separate opinion.

---

[8] The interpretative process is unaffected by the fact that a choice between secs. 304 and 351 produces a different treatment of other components in the type of transaction involved herein (basis of the redeemed stock under sec. 1.304–2(a), Income Tax Regs., or sec. 362(a), the treatment of an assumption of the transferor's indebtedness under sec. 304 or sec. 357, and the applicability to securities of sec. 317 or the nonrecognition provisions of sec. 351). Differences in treatment in the area of corporate distributions are not unknown where the statutory language affords no choice. Compare, for example, the treatment of "boot" in a transaction which otherwise complies with sec. 368(a)(1)(B) and in a sec. 351 transaction or a reorganization covered by sec. 354. Compare also fn. 4, *supra.*

