AZAR NUT CO., PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 10416-88.          Filed March 20, 1990.

*Hector Delgado,* for the petitioner.
*William R. Leighton,* for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in
petitioner's Federal income tax liability in the amount of
$51,228.38 for the tax year ended June 29, 1985. The sole
issue for our decision is whether petitioner is entitled to
deduct a loss of $111,366 on the resale of a terminated
executive's house in the tax year ended June 29, 1985.
Resolution of this issue is primarily dependent upon
whether petitioner held the house other than as a capital
asset inasmuch as petitioner was required to purchase the
house from its employee pursuant to the terms of an
employment contract.

OPINION

This case was submitted on a stipulation of facts with
exhibits attached pursuant to Rule 122.[1] The stipulation of
facts and attached exhibits are incorporated herein by this
reference.

Petitioner, Azar Nut Co., maintained its principal offices
in El Paso, Texas, at the time its petition herein was filed.
Petitioner timely filed its U.S. corporation income tax
return for the tax year ended June 29, 1985, with the

---

[1] All Rule references are to the Tax Court Rules of Practice and Procedure. All section
references are to the Internal Revenue Code of 1954 as amended and in effect for the years at
issue.

District Director of the Internal Revenue Service at Austin, Texas.

Petitioner's business is the processing, packaging, and marketing of nuts. Petitioner's business is based in El Paso, Texas, but it is engaged in sales on a national level.

In 1980, petitioner was a family-owned business and was managed primarily by two brothers, Edward Azar and Philip Azar (the Azar brothers). As the Azar brothers approached retirement age, they desired to gradually lessen their participation in the management of petitioner. Petitioner determined that in order for it to maintain and improve upon its success after the retirement of the Azar brothers, it would be necessary for petitioner to employ an experienced top executive to be trained to manage petitioner.

Petitioner (refers to the corporation, and its owners and officers) conducted a nationwide search for a high level executive who could be groomed to eventually become petitioner's president and chief executive officer. Through its various contacts in the food industry, petitioner learned of a potential executive recruit, Thomas L. Frankovic (Frankovic), who at the time was a senior vice president of sales for a Baltimore, Maryland, brewery.

One of petitioner's largest customers gave Frankovic a very favorable recommendation. Thereafter, petitioner contacted and interviewed Frankovic. Negotiations between petitioner and Frankovic ensued. During the negotiations Frankovic expressed his concern about the potential financial risks associated with relocating to El Paso. Frankovic desired, as a precondition to accepting employment with petitioner, contractual assurance that in the event petitioner terminated Frankovic's employment after relocating to and purchasing an El Paso residence (the house), he could again relocate without suffering an economic loss. Frankovic wanted protection against a potential loss on the sale of the house as well as protection against having to make mortgage payments on the house (as an absentee owner) pending its sale. Frankovic eventually insisted that he would not accept employment with petitioner unless it agreed to purchase the house for fair market value in the event petitioner terminated Frankovic's employment.

Initially, petitioner was reluctant to agree to Frankovic's demand because it lacked experience in holding, or a desire to hold, residential property or any other real estate other than its operating facilities. Moreover, petitioner had never before, nor since, purchased a house from an employee. Nevertheless, after consulting with various corporate executives in the industry, petitioner learned that, in order to obtain the services of qualified high level executives, corporations operating on a national scale were being forced to accept demands by prospective employees that upon the employees' termination, the prospective employers would purchase the employee's residence at fair market value. Petitioner therefore agreed to Frankovic's demands; however, petitioner entertained serious doubts about ever having to purchase the house because, based on Frankovic's qualifications, petitioner never expected that it would terminate Frankovic's employment.

Petitioner and Frankovic entered into an employment contract on July 21, 1981, the terms of which provided Frankovic with compensation and benefits, including the following:

### XII

In the event Frankovic's employment with Azar is terminated, Azar agrees to buy the house in El Paso purchased by Frankovic at the time he began his employment with Azar and agrees to pay the packing and moving expenses incurred by Frankovic in connection with his relocation to a state within the 48 contiguous states of the United States. In the event the parties cannot agree upon the value of such residence, each party shall select an MAI appraiser who has been appraising properties in El Paso County for at least five (5) years to make an appraisal of the residence. The average of the two appraisals shall be considered the value of the residence.

Approximately 2 years later, petitioner terminated Frankovic's employment due to unsatisfactory performance. Petitioner purchased the house pursuant to the terms of the employment contract. However, petitioner and Frankovic were initially unable to agree upon the fair market value of the house. Accordingly, each selected an appraiser and, after negotiations, petitioner agreed to purchase the house for $285,000. Petitioner did not investigate the house at any time prior to petitioner's purchase of the house. On August

4, 1983, petitioner and Frankovic executed an agreement and release which set forth the terms of Frankovic's termination, including the following:

5. *Purchase of El Paso House.* Pursuant to Paragraph XII of the Employment Contract, the Company shall purchase Frankovic's house located at 1028 Singing Hills Drive in the City of El Paso, Texas, for a total purchase price of TWO HUNDRED EIGHTY-FIVE THOUSAND AND NO/100 ($285,000.00) DOLLARS in cash * * * Frankovic shall surrender possession of the house on or before August 9, 1983.

In order to quickly recover the $285,000 paid for the house, and to minimize the maintenance expenses, petitioner executed an exclusive agency listing contract with one of El Paso's leading real estate brokers, listing the house for $285,000 during August 1983. Petitioner never considered the house as rental property nor was the house actually rented while held by petitioner because an immediate sale was desired and anticipated. Moreover, petitioner never considered or treated the house as investment property. Nevertheless, the house proved difficult to sell. Therefore, petitioner subsequently relisted the house on a nonexclusive agency basis.

Despite these efforts, the house was not sold until June 29, 1985. The house sold for $200,000 and petitioner realized $185,896 on the sale of the house. There were no offers on the house other than the purchaser's offer. Petitioner's basis in the house was $297,352. The parties have stipulated that the amount of the loss on the sale of the house, hereinafter referred to as the difference, was $111,366.

On its Form 1120 for the tax year ended June 29, 1985, petitioner included the amount of the difference as part of the total amount it claimed on line 26, as "Other Deductions." In his notice of deficiency, respondent determined, inter alia, that since petitioner did not establish "that any amount in excess of that allowed constitutes an ordinary and necessary business expense," the amount that petitioner claimed as "Other Deductions" was disallowed to the extent of $111,366. Petitioner advances alternate grounds in support of its position that the amount of the difference is deductible in full against its gross income for the tax year ended June 29, 1985. Petitioner contends that the amount

of the difference is deductible either as an ordinary and necessary business expense under section 162(a) or as an ordinary loss under section 165(a). Respondent asserts that, in the wake of the Supreme Court's decision in *Arkansas Best Corp. v. Commissioner*, 485 U.S. 212 (1988), the amount of the difference in the instant case can neither be deducted under section 162(a) nor under section 165(a), but rather can only be deducted by petitioner as a capital loss under section 165(f) inasmuch as the difference was occasioned by the sale of the house which was a capital asset within the meaning of section 1221.

Section 162 provides:

SEC. 162(a). IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

The question whether an amount paid or incurred is an ordinary and necessary business expense is often tested in the context of whether the expenditure was capital in nature. *Commissioner v. Tellier*, 383 U.S. 687, 689 (1966); *R.R. Hensler, Inc. v. Commissioner*, 73 T.C. 168, 178 (1979).

Petitioner proffers several contentions in support of its claim that the amount of the difference is deductible under section 162(a). Initially, petitioner asserts that the substance of the agreement requiring it to purchase the house upon termination of Frankovic's employment essentially represents a form of employee compensation. Thus, petitioner contends, it follows that the amount of the difference represents compensation which is fully deductible under section 162(a).

We disagree with petitioner for the following reasons. The amount that petitioner paid directly to Frankovic to satisfy its obligations under the employment contract represented nothing more than the fair market value of the house. There is nothing in the record before us to indicate that any portion of the purchase money petitioner paid to Frankovic represented a premium or additional amount in excess of the fair market value of the house that would otherwise constitute "compensation." Furthermore, any indicia of compensation that the amount of the difference may bear must be tempered by the fact that the amount of the

difference merely reflects the diminution in value of the house occurring *after* Frankovic's employment was terminated.

Next, petitioner asks us to view the property transaction "in a slightly different form." It is petitioner's position that instead of agreeing to purchase the house directly from Frankovic it could have agreed to reimburse Frankovic for any economic loss actually sustained on the sale of the house. In the alternative, petitioner asserts that it could have engaged the services of a third party to purchase Frankovic's house and then reimbursed the third party for any difference in the amount realized on the subsequent sale of the house. Petitioner contends that the amount of the reimbursement would have been fully deductible under either hypothetical scenario.

Without deciding the merits of these contentions, we find them to be of no assistance to petitioner because the hypothetical scenarios do not comport with the reality of the matter before us. The actual property transaction may not be disregarded simply because it could have been structured in a different way and may have resulted in a different tax consequence. *Haserot v. Commissioner*, 46 T.C. 864, 871 (1966), affd. sub nom. *Commissioner v. Stickney*, 339 F.2d 828 (6th Cir. 1968).

Furthermore, petitioner contends that because the house was purchased from Frankovic pursuant to the terms of the employment contract, it satisfied a business need, and, therefore, the amount of the difference is deductible as an ordinary and necessary business expense. Respondent maintains its position that the amount of the difference represents a capital loss because the house was a capital asset within the meaning of section 1221.

Petitioner cites several cases[2] in support of its position that the amount of the difference qualifies as an ordinary and necessary business expense under section 162 even though the house may be property squarely within the literal definition of a capital asset under section 1221.

[2]*Grier Co. v. Commissioner*, 328 F.2d 163 (7th Cir. 1964); *Commissioner v. Bagley & Sewall Co.*, 221 F.2d 944 (2d Cir. 1955), affg. 20 T.C. 983 (1953); *Enoch v. Commissioner*, 57 T.C. 781 (1972).

A common thread running through the cases cited by petitioner is an inquiry into whether the property was initially purchased by the taxpayer to satisfy a business need, motive, or nexus. However, only one of these cases, *Commissioner v. Bagley & Sewall Co.,* 221 F.2d 944 (2d Cir. 1955), affg. 20 T.C. 983 (1953), upon which petitioner heavily relies, sustained an ordinary and necessary business expense deduction in the amount of the difference realized on the subsequent sale of property initially purchased to satisfy a business necessity. In affirming this Court's decision, the Court of Appeals for the Second Circuit indicated that the propriety of an ordinary and necessary business expense deduction can be determined by reference to the property's connection with the taxpayer's business without having to specifically consider the property's status as a capital asset.

However, of particular relevance to our decision in *Bagley & Sewall Co.* was a finding that, unlike in the instant case, the taxpayer was not required under contract to make an investment in any property. *Bagley & Sewall Co. v. Commissioner,* 20 T.C. at 989. In any event, the cases cited by petitioner in support of its position must be examined in the light of the Supreme Court's recent opinion regarding the tax treatment of property transactions in *Arkansas Best Corp. v. Commissioner, supra,* and the admonitory language contained therein.

In *Arkansas Best Corp. v. Commissioner,* the Supreme Court held that with respect to a property transaction, the relevant inquiry is whether the property falls within the broad-based definition of a capital asset or whether it is the subject of a specific statutory exclusion under section 1221. Thus, an inquiry into the taxpayer's motivation with respect to the acquisition of the asset giving rise to the disputed gain or loss is irrelevant. *Arkansas Best Corp. v. Commissioner, supra* at 224. Furthermore, a business connection is relevant only in determining the applicability of certain of the statutory exceptions to the definition of a capital asset. *Arkansas Best Corp. v. Commissioner, supra* at 222.

Nevertheless, petitioner contends that since *Arkansas Best Corp. v. Commissioner,* involved an application of

section 1221(1), it is not relevant to the instant case. We disagree with petitioner's unduly restrictive reading of *Arkansas Best Corp.* because petitioner's reading is in tension with the clear import of the Supreme Court's opinion.

Noticeably absent from the Supreme Court's opinion is any language limiting the scope of its applicability to section 1221(1). Furthermore, the Supreme Court clearly refused to embrace the sweeping view of those cases according ordinary asset treatment to any property acquired for business purposes as opposed to investment purposes. *Arkansas Best Corp. v. Commissioner, supra* at 216. Instead, the Supreme Court, speaking in general terms, noted that if a broad exclusion from capital asset status is to be created for assets acquired for business purposes, it must come from Congress, not the courts. *Arkansas Best Corp. v. Commissioner, supra* at 222 n. 7. Moreover, the Supreme Court pointed out that section 1221 defines a capital asset as *all* property that is not the subject of a specific statutory exclusion, without any "consideration of the property's connection with the taxpayer's business." *Arkansas Best Corp. v. Commissioner, supra* at 216. We find these broad-based directives particularly telling.

Because *Arkansas Best Corp.* instructs us to focus our initial inquiry on the status of the house as a capital asset, and not on whether the house was connected with petitioner's business, we now turn our attention to a determination of whether the house was a capital asset.

Section 1221 defines the term "capital asset" as property held by the taxpayer (whether or not connected with his trade or business) but does not include, inter alia, property, used in the taxpayer's trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in the taxpayer's trade or business. It is important to note that a house is most naturally viewed as a capital asset and, more importantly, it generally fits the section 1221 statutory definition of a capital asset. See *Arkansas Best Corp. v. Commissioner, supra* at 977. Moreover, there can be no serious question that when petitioner purchased the house, the amount it paid out to Frankovic constituted a capital expenditure. See

sec. 263(a)(1); see also sec. 1.263(a)(2)(a), Income Tax Regs. Thus, the amount of the difference represents a prima facie loss from the sale of a capital asset.

However, petitioner contends in the alternative that the loss incurred on the sale of the house is deductible as an ordinary loss under section 165(a) and is not a capital loss subject to section 165(f) "because the house was property used in petitioner's business," and, therefore, falls within the section 1221(2) exception to the definition of a capital asset. Although it is permissible, as petitioner asserts, for a taxpayer to deduct an amount under one Code section instead of some other Code section where the same amount qualifies as a deduction under either Code section, *R.R. Hensler, Inc. v. Commissioner, supra* at 176, due to our ultimate finding that the amount of the difference in the instant case can only be characterized as a capital loss, the availability of a deduction therefor is limited to the provisions under section 165(f).

The term "used in trade or business" means "devoted to the trade or business and includes property purchased with a view to" its present or future use in the taxpayer's business. *Alamo Broadcasting Co. v. Commissioner,* 15 T.C. 534, 541 (1950); *Carter-Colton Cigar Co. v. Commissioner,* 9 T.C. 219, 221 (1947). Although it is clear that the purchase of the house was connected with petitioner's trade or business affairs, it is equally clear that this connection does not satisfy the "used in" requirement of section 1221(2). To equate a trade or business connection with a trade or business use would render the section 1221 parenthetical "whether or not connected with its trade or business" meaningless. See *Arkansas Best Corp. v. Commissioner, supra* at 216. We find nothing in the record before us to indicate that petitioner intended to use the house in its trade or business at any time. Indeed, petitioner intended to dispose of the house as soon as possible. Thus, the house was not purchased for use, present or future, in petitioner's trade or business within the meaning of section 1221(2).

We find that the house was a capital asset in petitioner's hands because it was property not within any of the statutory exceptions to the definition of a capital asset under section 1221. Therefore, the loss realized on the sale

of the house was a loss from the sale or exchange of a capital asset, a deduction for which is provided under section 165(f) but "only to the extent allowed in sections 1211 and 1212." Sec. 165(f).

We have reviewed petitioner's remaining contentions and find them to be without merit.

In view of the foregoing,

*Decision will be entered for the respondent.*