122 T.C. No. 19

UNITED STATES TAX COURT

DOVER CORPORATION AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12821-00.                    Filed May 5, 2004.

D and H, United Kingdom corporations, were
controlled foreign corporations with respect to P. H
was a wholly owned subsidiary of D. In 1997, D sold
the stock of H to an unrelated third party. In 1999, P
requested that H be granted an extension of time to
retroactively elect to be treated as a "disregarded
entity" pursuant to sec. 301.7701-3, Proced. & Admin.
Regs., effective "immediately prior to" D's sale of the
H stock. R granted the requested extension of time on
Mar. 31, 2000. H's retroactive disregarded entity
election was filed on or about Oct. 10, 1999. Pursuant
to that election, there was, for Federal tax purposes,
a deemed sec. 332, I.R.C., liquidation of H followed
immediately by D's deemed sale of H's assets, rather
than a sale by D of the H stock.

<u>Held</u>: In light of R's administrative guidance
pertaining to the tax effects of a liquidation governed
by secs. 332 and 381, I.R.C., D's deemed sale of H's
assets constitutes a sale of property used in D's trade
or business within the meaning of sec. 1.954-

2(e)(3)(ii) through (iv), Income Tax Regs., with the result that D's gain on that sale does not constitute Subpart F (foreign personal holding company) income to P pursuant to sec. 954(c)(1)(B)(iii), I.R.C. <u>Rauenhorst v. Commissioner</u>, 119 T.C. 157 (2002), applied.

<u>Robert D. Whoriskey</u>, <u>George Pompetzki</u>, <u>Eduardo A. Cukier</u>, and <u>Linda Galler</u>, for petitioner.

<u>Lyle B. Press</u>, for respondent.

OPINION

HALPERN, <u>Judge</u>:  Dover Corporation (petitioner) is the common parent of an affiliated group of corporations making a consolidated return of income (the group or affiliated group). By notice of deficiency dated September 14, 2000 (the notice), respondent determined deficiencies in Federal income tax for the group for its 1996 and 1997 taxable (calendar) years in the amounts of $9,329,596 and $24,422,581, respectively.  All but one of the adjustments that gave rise to those determinations have been settled, and this report addresses the sole remaining issue, which involves an interaction between the so-called check-the-box regulations and the definition of foreign personal holding company income (FPHCI); viz, whether the deemed sale of assets immediately following their deemed receipt (pursuant to the check-the-box regulations) from a disregarded foreign entity gives rise to FPHCI.

Unless otherwise stated, all section references are to the Internal Revenue Code in effect for 1997, the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

### Introduction

This case was submitted for decision without trial pursuant to Rule 122. Facts stipulated by the parties are so found. The stipulation of facts filed by the parties, with attached exhibits, is included herein by this reference. Respondent objects, on the grounds of relevance, to 26 exhibits referenced in certain of the stipulations. See the discussion infra section IV.

Petitioner is a Delaware corporation, whose shares are publicly traded and which maintains its principal place of business in New York, New York.

### Business Activities of the Affiliated Group

Together, the affiliated group is a diversified industrial manufacturer, producing through its members and foreign subsidiaries a broad range of products and sophisticated manufacturing equipment for other industries and businesses. During and prior to 1997, the group's business activities were divided into five business groups, one of which was known as Dover Elevator.

Dover Elevator

Dover Elevator, like each of the other business groups, was managed by a headquarters corporation, Dover Elevator International, Inc. (DEI), a domestic corporation. However, not all of the corporations that constituted Dover Elevator were direct or indirect subsidiaries of DEI. During 1997, DEI's United Kingdom (UK) elevator business was conducted by Hammond & Champness Limited (H&C), a UK corporation engaged in the business of installing and servicing elevators. H&C was wholly owned by a UK holding company, Dover U.K. Holdings Limited (Dover UK), which was wholly owned by a Delaware corporation, Delaware Capital Formation (DCF), which, finally, was wholly owned by petitioner.

Sale of H&C

On June 30, 1997, Dover UK and petitioner entered into an agreement with Thyssen Industrie Holdings U.K. PLC (Thyssen), a German corporation registered in England and Wales, and its German parent, Thyssen Industrie AG, for the sale by Dover UK to Thyssen of the entire issued share capital of H&C (the agreement or stock sale agreement). The agreement provided that it and other specified documents and agreements relating to the sale were to be held in escrow until the "Escrow Release Date" (July 11, 1997), by which time it was anticipated that the purchaser would have "completed its due diligence inquiries, and * * * determined that it does wish to proceed with * * * [the sale]"

(the "escrow condition").  Dover UK, as "Vendor", also agreed to accomplish certain document deliveries and undertakings by July 11, at which time Thyssen, as "Purchaser", was required to "satisfy the consideration for the Shares".  Dover UK also agreed to carry on the H&C business "in the normal course without any interruption" between June 30 and July 11, 1997.  On July 11, 1997, Thyssen notified Dover UK that the escrow condition had been satisfied, and (we assume, since there is no stipulation) the purchase price was received by Dover.[1]

Petitioner obtained an opinion of UK counsel dated July 3, 2001, that, as a matter of English law, beneficial title to the H&C shares passed from Dover UK to Thyssen on July 11, 1997, when the escrow condition was satisfied.

Retroactive Election To Treat H&C as a Disregarded Entity

By letter dated December 3, 1998, petitioner, on behalf of its (then) former indirect subsidiary, H&C, requested that respondent grant an extension of time, pursuant to sections 301.9100-1(c) and 301.9100-3, Proced. & Admin. Regs., for H&C to file a retroactive election to be a disregarded entity for Federal tax purposes (the request for 9100 relief).

---

[1]  DEI sold its German elevator service subsidiaries to Thyssen effective June 1, 1997, and members of the affiliated group sold the remainder of the group's elevator business, within and without the United States, to Thyssen Industrie AG and Thyssen Elevator Holding Corp. in January 1999.  Thus, in a series of three transactions, the Thyssen group purchased the group's worldwide elevator business.

Specifically, petitioner requested:  "H&C be granted an extension of time to make an election: (a) * * * to be disregarded as an entity separate from its owner for U.S. tax purposes and (b) effective immediately prior to the sale of stock in H&C by Dover UK to Thyssen UK."[2]  In the request for 9100 relief, petitioner stated that the date of the sale was June 30, 1997, and, on the Form 8832, Entity Classification Election (Form 8832), attached to the request for 9100 relief, it set forth June 30, 1997, as the proposed effective date of the election.

Initially, respondent was reluctant to grant the request for 9100 relief, in large part, because, in respondent's view, petitioner should not be entitled to benefits it might claim resulted from the disregarded entity election; i.e., the avoidance of FPHCI on the deemed sale of the H&C assets. However, after representatives of petitioner and respondent conferred, and petitioner made a supplemental submission, respondent, on March 31, 2000, granted the requested relief. Specifically, respondent granted to H&C "an extension of time for making the election to be disregarded as an entity separate from

_____

[2]  Pursuant to sec. 301.7701-3(c)(1)(iii), Proced. & Admin. Regs., H&C could have made the election to be a disregarded entity at any time within 75 days after the date (June 30, 1997), specified on the election form (Form 8832, Entity Classification Election).  Because petitioner inadvertently missed that deadline, it was required to request an extension of time, pursuant to secs. 301.9100-1(c) and 301.9100-3, Proced. & Admin. Regs., to make the election.

its owner for federal tax purposes, effective immediately prior to the sale on * * * [June 30, 1997[3]], until 60 days following the date of this letter." Respondent, however, added the following caveat:

> no inference should be drawn from this letter that any gain from the sale of * * * [H&C's] assets immediately following its election to be disregarded as an entity separate from its owner gives rise to gain that is not foreign personal holding company income as defined in section 954(c)(1)(B) of the Internal Revenue Code.

On or about October 10, 1999, H&C made an election on Form 8832 to be disregarded as a separate entity. The Form 8832 specifies that the election is to be effective beginning June 30, 1997.

## Discussion

### I. Introduction

This case presents an issue of first impression and, insofar as we are aware, the first occasion that any court has had to opine on the impact of the so-called check-the-box regulations on the application of a specific provision of the Internal Revenue Code of 1986 (the Code), in this case, section 954(c)(1)(B)(iii) (defining, in part, FPHCI).[4]

---

[3] Based upon petitioner's representation, that is the assumed date of the sale of the H&C stock by Dover UK.

[4] There has, however, been much commentary concerning the issue before us today. E.g., Sheppard, "Behind the Eight Ball on Check-the-Box Abuses", 101 Tax Notes 437 (Oct. 27, 2003); Yoder & Everson, "Check-and-Sell Transactions: Proposed Regulations

(continued...)

## II. Code and Regulations

### A. The Code

The provision of the Code principally at issue is section 954. Section 954 is found in subpart F of part III, subchapter N, chapter 1, subtitle A of the Code (Subpart F), which encompasses sections 951-964. Subpart F is concerned with controlled foreign corporations (CFCs). Neither party disputes that, in 1997, both Dover UK and H&C (up until it became a disregarded entity) were CFCs, as that term is defined in section 957(a). Section 951 provides that each United States shareholder of a CFC shall include in gross income certain amounts, including "his pro rata share * * * of the * * * [CFC's] subpart F income" for the taxable year. Sec. 951(a)(1)(A)(i).[5] Subpart F income includes "foreign base company income (as determined under section 954)". Sec. 952(a)(2). Pursuant to section 954(a)(1), foreign base company income includes FPHCI, which is defined, in pertinent part, in section 954(c) as follows:

(c) Foreign Personal Holding Company Income.--

(1) In general.--For purposes of subsection (a)(1), the term "foreign personal holding company income" means the

---

[4](...continued)
Withdrawn, But Still Under Attack", 32 Tax Mgmt. Int. J. 515 (Oct. 10, 2003); Click, "Treasury Withdraws Extraordinary Check-the-Box Regulations", 101 Tax Notes 95 (Oct. 6, 2003).

[5] The parties do not dispute that petitioner constituted a "United States shareholder", as defined in sec. 951(b), with respect to Dover UK on the date of the sale of the H&C stock.

portion of the gross income which consists of:

\* \* \* \* \* \* \*

(B) Certain property transactions.--The excess of gains over losses from the sale or exchange of property--

\* \* \* \* \* \* \*

(iii) which does not give rise to any income.

B.  The Regulations

1.  Regulations Under Section 954(c)(1)(B)(iii)

In pertinent part, section 1.954-2(e)(3), Income Tax Regs., which defines "property that does not give rise to income", provides:

(3) Property that does not give rise to income. Except as otherwise provided in this paragraph (e)(3), for purposes of this section, the term property that does not give rise to income includes all rights and interests in property (whether or not a capital asset) including, for example, forwards, futures and options. Property that does not give rise to income shall not include--

\* \* \* \* \* \* \*

(ii) Tangible property (other than real property) used or held for use in the controlled foreign corporation's trade or business that is of a character that would be subject to the allowance for depreciation under section 167 or 168 and the regulations under those sections (including tangible property described in section 1.167(a)-2);

(iii) Real property that does not give rise to rental or similar income, to the extent used or held for use in the controlled foreign corporation's trade or business;

>           (iv) Intangible property (as defined in
>      section 936(h)(3)(B)), goodwill or going
>      concern value, to the extent used or held for
>      use in the controlled foreign corporation's
>      trade or business[.]

In pertinent part, section 1.954-2(a)(3), Income Tax Regs., provides: "The use * * * for which property is held is that use * * * for which it was held for more than one-half of the period during which the controlled foreign corporation held the property prior to the disposition."

### 2. The Check-the-Box Regulations

### a. Development and Issuance of the Regulations

The Commissioner announced, in Notice 95-14, 1995-1 C.B. 297, that the Internal Revenue Service (IRS) and the Department of the Treasury (Treasury) were considering simplifying the entity classification regulations to allow taxpayers to treat both domestic (unincorporated) and foreign business organizations as partnerships or associations (generally taxable as corporations) on an elective basis.  In Notice 95-14, the Commissioner justified the proposed radical departure from the existing classification regulations by observing that, as a "consequence of the narrowing of the differences under local law between corporations and partnerships * * * taxpayers can achieve partnership tax classification for a non-publicly traded organization that, in all meaningful respects, is virtually indistinguishable from a corporation."  Id.  The Commissioner

further observed that the proliferation of revenue rulings, revenue procedures, and letter rulings determining or relating to the classification for Federal tax purposes of limited liability companies and partnerships formed under State law had made the existing classification regulations unnecessarily cumbersome to administer, and the resulting complexities risked leaving small unincorporated organizations with insufficient resources and expertise to apply the current classification regulation to achieve the organization's desired classification. Id. The Commissioner also stated that, because the same types of concerns "are mirrored in the foreign context," the IRS and Treasury "are considering simplifying the classification rules for foreign organizations". Id. at 298. Notice 95-14 invited comments and scheduled a public hearing. Id. at 299.

In 1996, the written comments and public hearing were followed by the issuance of, first, proposed and, then, final classification regulations. See PS-43-95, Proposed Income Tax Regs., 61 Fed. Reg. 21989 (May 13, 1996) (the proposed regulations); T.D. 8697 (December 18, 1996), 1997-1 C.B. 215 (the final regulations). The classification regulations are commonly referred to as the "check-the-box" regulations because of their elective feature. See, e.g., Schler, "Initial Thoughts on the Proposed 'Check-the-Box' Regulations", 71 Tax Notes 1679 (June 17, 1996).

Not only did both sets of regulations permit most domestic (unincorporated) and foreign business organizations to elect between association and partnership classification for Federal tax purposes, as first proposed in Notice 95-14,[6] but, of particular relevance to this case, they both extended the elective regime to single-owner organizations.  Under the final regulations, single-owner organizations are permitted to elect "to be recognized or disregarded as entities separate from their owners."  Sec. 301.7701-1(a)(4), Proced. & Admin. Regs.

The final regulations became effective as of January 1, 1997, with a special transition rule for existing entities.  T.D. 8697, 1997-1 C.B. at 219.[7]

--------

[6]  The final regulations provide a list of organizations (substantially the same as those listed in the proposed regulations) formed under foreign (or U.S. possession) law that, subject to certain grandfather rules, are treated as per se corporations.  See sec. 301.7701-2(b)(8), (d), Proced. & Admin. Regs.  In general, the list includes the publicly traded, limited liability organization that may be formed under the law of each country or possession.  The per se corporation under United Kingdom law is a public limited company.  H&C was not such a company.

[7]  The check-the-box regulations, like the classification regulations that they replaced, were issued under sec. 7701(a)(2) and (3), which defines the terms "partnership" and "corporation". Some commentators have questioned whether the regulations constitute a valid exercise of the Treasury Secretary's authority under sec. 7805(a) to issue interpretive regulations. See, e.g., Staff of Joint Committee on Taxation, Review of Selected Entity Classification and Partnership Tax Issues, at 13-17 (J. Comm. Print Apr. 18, 1997); McKee et al., Federal Taxation of Partnerships and Partners, par. 3.08 at 3-102 (3d ed. 1997); Dougan et al., "Check The Box"--Looking Under The Lid, 75

(continued...)

The preamble to the final regulations contains the following

warning to taxpayers:

> in light of the increased flexibility under an elective
> regime for the creation of organizations classified as
> partnerships, Treasury and the IRS will continue to
> monitor carefully the uses of partnerships in the
> international context and will take appropriate action
> when partnerships are used to achieve results that are
> inconsistent with the policies and rules of particular
> Code provisions or of U.S. tax treaties.  [T.D. 8697,
> 1997-1 C.B. at 216.]

The preamble to the proposed regulations contains a substantially

identical warning, except that the promise is to "issue

appropriate substantive guidance" rather than "take appropriate

action" with regard to the use of partnerships for what Treasury

and IRS consider improper purposes in the international context.

See 61 Fed. Reg. at 21990 (May 13, 1996).  We surmise that the

change in language signaled an intent not only to address

perceived abuses in the use of partnerships in amended

regulations, revenue rulings, or other public pronouncements

that, generally, would have prospective effect but also to

challenge those perceived abuses on audit.  For no apparent

reason, the warning did not extend to allegedly inappropriate

uses of disregarded entities, the type of organization involved

in this case.

---

[7](...continued)
Tax Notes 1141, 1143-1144 (May 26, 1997); Mundstock, A Unified
Approach To Subchapters K & S, 11 n.35 (2002).  Neither party has
challenged the validity of all or any portion of the regulations.
Therefore, for purposes of this case, we accept (without
deciding) that the regulations are valid.

b.  Amendments to the Regulations

Since they were issued, the (final) check-the-box regulations have been amended several times.  The only relevant amendments were additions to the regulations that, together, constitute the existing paragraph (g) of section 301.7701-3, Proced. & Admin. Regs.  See T.D. 8844, 1999-2 C.B. 661, 666-667; T.D. 8970, 2002-1 C.B. 281, 282.  Although those amendments are generally effective as of the dates of issuance (November 29, 1999, and December 17, 2001, respectively), both amendments provide for retroactive application for elections filed before those dates if all affected persons take consistent filing positions.  See sec. 301.7701-3(g)(2)(ii), (4), Proced. & Admin. Regs.  The parties have stipulated that the election by H&C, on Form 8832, to be a disregarded entity was filed on or about October 10, 1999, which precedes the general effective dates. On brief, both parties have cited and relied upon portions of section 301.7701-3(g), Proced. & Admin. Regs.  Therefore, we find that the parties agree to the retroactive application of paragraph (g) of section 301.7701-3, Proced. & Admin. Regs., to H&C's disregarded entity election.

c.  Applicable Provisions of the Regulations

Section 301.7701-3(a), Proced. & Admin. Regs., sets forth the general rule that "[a] business entity that is not classified

as a corporation * * * can elect its classification for federal tax purposes as provided in this section".

In pertinent part, section 301.7701-3(g)(1)(iii), Proced. & Admin. Regs., provides:

> (iii) Association to disregarded entity.  If an eligible entity classified as an association elects * * * to be disregarded as an entity separate from its owner, the following is deemed to occur:  The association distributes all of its assets and liabilities to its single owner in liquidation of the association.

Section 301.7701-2(a), Proced. & Admin. Regs., states that, "if * * * [an] entity is disregarded, its activities are treated in the same manner as a sole proprietorship, branch, or division of the owner".

Under section 301.7701-3(c)(1)(i), Proced. & Admin. Regs., a classification election, including an election to change classification, is made by filing a Form 8832 with the IRS service center designated on that form.  Under subdivision (iii), the election is effective "on the date specified by the entity on Form 8832" if, as in this case, one is specified.

Under section 301.7701-3(g)(3)(i), Proced. & Admin. Regs., an election to change classification "is treated as occurring at the start of the day for which the election is effective", and "[a]ny transactions that are deemed to occur * * * as a result of a change in classification [e.g., in the case of a change in classification from association to disregarded entity, the deemed liquidation] are treated as occurring immediately before the

close of the day before the election is effective". For example, if H&C's disregarded entity election is effective as of the start of business on June 30, 1997, the deemed liquidation of H&C is treated as occurring immediately before the close of business on June 29, 1997.

The making of a disregarded entity election "is considered to be the adoption of a plan of liquidation immediately before the deemed liquidation", thereby qualifying the parties to the deemed liquidation for tax-free treatment under sections 332 and 337. Sec. 301.7701-3(g)(2)(ii), Proced. & Admin. Regs.

Lastly, section 301.7701-3(g)(2)(i), Proced. & Admin. Regs., provides:

> (2) <u>Effect of elective changes</u>.--(i) In general. The tax treatment of a change in the classification of an entity for federal tax purposes by election under paragraph (c)(1)(i) of this section is determined under all relevant provisions of the Internal Revenue Code and general principles of tax law, including the step transaction doctrine.

The preamble to the 1997 proposed regulations, which contains the identical provision, explains the purpose of the above quoted provision:

> This provision * * * is intended to ensure that the tax consequences of an elective change will be identical to the consequences that would have occurred if the taxpayer had actually taken the steps described in the * * * regulations. [REG-105162-97, 62 Fed. Reg. 55768 (Oct. 28, 1997).]

III.  Summary of the Parties' Arguments

A.  Petitioner's Argument

Petitioner argues that, by permitting a corporate taxpayer to "disregard" the separate entity status of a subsidiary and, instead, treat the subsidiary's business as a hypothetical branch or division of the parent, the check-the-box regulations override the principle, based upon Moline Props., Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943), that the separate entity status of a corporation may not be ignored for Federal tax purposes.  As a result (as petitioner sees it), Dover UK is deemed not only to sell H&C's assets (rather than its shares in H&C) but is deemed to be engaged in H&C's business at the time of that sale. Therefore, petitioner argues that the H&C assets are excluded, by section 1.954-2(e)(3)(ii) through (iv), Income Tax Regs., from the definition of property "which does not give rise to any income", with the result that the deemed sale of those assets did not give rise to FPHCI pursuant to section 954(c)(1)(B)(iii).[8]

Alternatively, petitioner argues that, giving effect to the "plain and ordinary meaning" of section 954(c)(1)(B)(iii), Dover UK's deemed sale of the operating assets of H&C "could not

_____

[8]  We find the parties to be in agreement that, whatever our decision regarding the issue of whether Dover UK's deemed sale of the H&C operating assets constituted a sale of "property which does not give rise to any income", that decision applies to all of H&C's assets as of the date of the deemed asset sale to Thyssen.

possibly have been a sale of property 'which does not give rise to any income' because those assets were components of an active, ongoing commercial enterprise, which <u>did</u> give rise to income." Therefore, petitioner argues that, because the requirement in section 1.954-2(e)(3)(ii) through (iv), Income Tax Regs., that such assets be used in the <u>seller's</u> trade or business goes beyond the narrow statutory mandate that such assets simply not be property "which does not give rise to any income", that regulation is invalid.

B. <u>Respondent's Arguments</u>

Respondent argues that the deemed sale of the H&C operating assets was not a sale of property used or held for use in Dover UK's business. Therefore, respondent continues, that property was not excluded from the definition of property "which does not give rise to any income" pursuant to section 1.954-2(e)(3)(ii) through (iv), Income Tax Regs., and its deemed sale by Dover UK gave rise to FPHCI taxable to petitioner. Secs. 951(a)(1)(A)(i), 952(a)(2), 954(a)(1), (c)(1)(B)(iii).

Based primarily on the statutory language and legislative history of section 954(c)(1)(B), respondent also rejects petitioner's argument that section 1.954-2(e)(3)(ii) through (iv), Income Tax Regs., is invalid.

IV.  Motion and Evidentiary Objection

   A.  Petitioner's Motion To Strike

      1.  Introduction

   On July 14, 2003, after the parties' submission of briefs, pursuant to Rule 52, petitioner moved to strike respondent's argument that, as a matter of law, the doctrine of duty of consistency mandates a finding that Dover UK's sale of H&C stock to Thyssen was completed as of June 30, 1997, not July 11, as urged by petitioner.

      2.  Duty of Consistency Argument

   In its motion, petitioner denies that it is attempting to "change or recharacterize the facts [regarding the date of the sale of the H&C stock] in this fully stipulated case" or that it has "acted in a deceitful or misleading way" as implied by respondent.  Rather, petitioner states that (1) the issue as to whether the stock sale agreement provided for a June 30 or July 11 sale of the H&C stock presents an issue of law and (2) its prior representation that the date of sale was June 30, 1997, constituted "a clear cut mistake of law * * * not a misrepresentation of fact".  Petitioner also argues that respondent was not surprised by petitioner's argument because, on December 12, 2001, more than a year before it filed its opening brief, on March 5, 2003, petitioner apprised respondent of its new position regarding the date of sale.  That notification

consisted of a letter to respondent's counsel enclosing a copy of an opinion of U.K. counsel that, under English law, July 11, 1997, was the actual date on which the sale of the H&C stock was completed.

Respondent objects to petitioner's motion on the ground that (1) respondent's position is nothing more than a legitimate legal argument and (2) petitioner has not shown that respondent's arguments are "redundant, immaterial, impertinent, frivolous, or scandalous matter" within the meaning of Rule 52.

In essence, petitioner's motion raises the issue of whether we should strike respondent's attack on petitioner's argument that the sale of the H&C stock occurred on July 11, 1997, the date referred to in the stock sale agreement as the "escrow release date", rather than on June 30, 1997, the date of that agreement and the date represented by petitioner to be the date of sale in the request for 9100 relief. In framing that issue, the parties have assumed that, were we to find that the stock sale occurred on July 11, 1997, rather than on June 30, 1997, there necessarily would be an 11-day period between the deemed liquidation of H&C into Dover UK and Dover UK's deemed sale of the H&C operating assets, during which period Dover UK must be deemed to have operated the H&C business as its own. Under those circumstances, petitioner's assertion that Dover UK's deemed sale of the H&C operating assets constituted a sale of property used

in its (Dover UK's) business is arguably more persuasive than it would be if the assets are deemed to have been sold immediately after the deemed liquidation of H&C.

The underlying assumption by both parties is that, whether the sale of the H&C stock (and, therefore, the deemed sale of H&C's assets) occurred on June 30 or July 11, 1997, the deemed liquidation of H&C is considered to have occurred immediately before the close of business on June 29, 1997, the day before the effective date of H&C's disregarded entity election, as specified in the Form 8832 filed by H&C.  See sec. 301.7701-3(c)(1)(iii), (g)(3)(i), Proced. & Admin. Regs.  We question that underlying assumption.  In its initial request for 9100 relief, petitioner specifically requested that "H&C be granted an extension of time to make * * * [a disregarded entity election] effective immediately prior to the sale of stock in H&C by Dover UK to Thyssen UK".  (Emphasis added.)  Consistent with petitioner's request, respondent granted to H&C, "an [60-day] extension of time for making [a disregarded entity] election * * * effective immediately prior to the sale [of H&C stock] on [June 30, 1997]".  (Emphasis added.)  Both petitioner, in filing the Form 8832 listing June 30, 1997, as the effective date of the disregarded entity election, and respondent, in accepting that filing, believed that June 30, 1997, was the date of the H&C stock sale and that the deemed liquidation occurred "immediately prior to"

that sale.  Therefore, although it is not addressed by the parties, we believe that the parties' mutual understanding that the deemed liquidation of H&C was to be "effective immediately prior to" the sale of the H&C stock raises an issue as to whether that deemed liquidation should be treated as occurring (1) "immediately prior to" the sale, whether that sale occurred on June 30 or July 11, 1997, or (2) regardless of the actual date of sale, immediately before the close of business on June 29, 1997, the day before the effective date of the disregarded entity election, as specified in the Form 8832 filed by H&C.  We find it unnecessary to resolve that issue, however, because, as discussed <u>infra</u> section V.C., our decision does not depend upon the length of time between the deemed liquidation of H&C and the actual sale of its stock (i.e., deemed sale of its assets).

Because resolution of the date-of-sale issue is unnecessary to our decision in this case, the issue as to whether respondent's duty of consistency argument should be stricken is essentially moot.

### 3.  <u>Conclusion</u>

Petitioner's motion to strike will be denied.

### B.  <u>Respondent's Objection to Stipulated Exhibits</u>

The exhibits to which respondent objects on the grounds of relevance were all executed in connection with the sale of the H&C stock to Thyssen.  They were introduced by petitioner in

order to show the multiplicity of steps taken and documents executed between June 30 and July 11, 1997, in order to complete the sale in accordance with the terms of the June 30, 1997, agreement.  As stated <u>supra</u> section IV.A.2., our decision in this case does not depend upon the actual date of the H&C stock sale.  As a result, respondent's evidentiary objection, like petitioner's motion to strike respondent's duty-of-consistency argument, is essentially moot.  Therefore, we shall overrule respondent's objection.

V.   <u>Status of the H&C Assets as Assets Used in Dover UK's</u>
     <u>Business:  Application of Section 1.954-2(e)(3), Income Tax</u>
     <u>Regs.</u>

     A.   <u>Introduction</u>

     Petitioner argues that Dover UK's deemed sale of the H&C assets qualifies as a sale of property used in Dover UK's trade or business.  Therefore, pursuant to section 1.954-2(e)(3)(ii) through (iv), Income Tax Regs., that property is not, within the meaning of section 954(c)(1)(B)(iii), property "which does not give rise to any income", and Dover UK's sale does not give rise to FPHCI taxable to petitioner.  In support of its argument, petitioner relies upon the check-the-box regulations and revenue rulings previously issued by respondent.  Respondent disagrees on the basis of caselaw, which he cites in support of his argument that Dover UK's deemed sale of the H&C operating assets did not constitute a sale of assets "used or held for use" in Dover UK's

business within the meaning of section 1.954-2(e)(3)(ii) through (iv), Income Tax Regs.

B.  The Relevant Authorities

1.  Section 301.7701-2(a), Proced. & Admin. Regs.

Petitioner argues that "the check-the-box regulations * * * impose continuity of business enterprise as a consequence of * * * [a disregarded entity] election", citing section 301.7701-2(a), Proced. & Admin. Regs.  In pertinent part, that regulation provides:  "If * * * [a business entity with only one owner] is disregarded, its activities are treated in the same manner as a sole proprietorship, branch or division of the owner."

Petitioner argues:  "As a consequence [of the above-quoted regulation], there was as a matter of law and under respondent's own check-the-box regulations * * * a continuing business use of H&C's assets, which were deemed to be a branch or division of Dover UK."

2.  The Revenue Rulings

Petitioner also argues that respondent's position in this case is "wholly inconsistent with" his position contained in published revenue rulings, which, under principles derived from the attribute carryover rules of section 381(c) applicable to section 332 liquidations, "unequivocally attribute the trade or business of a subsidiary that is liquidated under section 332 to its parent."  Therefore, because H&C's disregarded entity

election involved a deemed section 332 liquidation of H&C, see sec. 301.7701-3(g)(1)(iii) and (2)(ii), Proced. & Admin. Regs., petitioner concludes that respondent's position violates the principle of Rauenhorst v. Commissioner, 119 T.C. 157, 182-183 (2002), that "taxpayers should be entitled to rely on revenue rulings in structuring their transactions, and they should not be faced with the daunting prospect of the Commissioner's disavowing his rulings in subsequent litigation".

The revenue rulings cited by petitioner involve the question of whether the liquidation of a subsidiary followed by a pro rata distribution of the proceeds of the sale of the subsidiary's assets to the parent's shareholders in partial redemption of the parent's stock may qualify as a partial liquidation of the parent under former section 346(a)(2).[9]

The seminal ruling upon which petitioner relies is Rev. Rul.

---

[9] At the time of the issuance of the revenue rulings cited by petitioner, secs. 331 and 336 governed the tax consequences to the shareholders and distributing corporation, respectively, of a partial (or complete) liquidation of the corporation, and sec. 346(a) defined the term "partial liquidation". Sec. 222 of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 478, amended (1) sec. 346 to eliminate the definition of "partial liquidation" contained therein and (2) secs. 331 and 336 to omit the reference in each to a partial liquidation. Sec. 222 of TEFRA also amended (1) sec. 302(e) so that, essentially, it embodies the former sec. 346(a) definition of a partial liquidation, and (2) sec. 302(b)(4), so that it treats a redemption of stock from a non-corporate shareholder in connection with a partial liquidation of the distributing corporation as a distribution in part or full payment in exchange for the stock under sec. 302(a).

75-223, 1975-2 C.B. 109.  That ruling describes three situations in which a parent corporation (P) disposes of a wholly owned operating subsidiary (S).  In situation 1, P liquidates S in a tax-free section 332 liquidation and sells the S assets for cash.  P distributes the cash to P's shareholders in redemption of a portion of their P stock.  Situation 2 is the same as situation 1 except that S sells its own assets for cash prior to the section 332 liquidation and subsequent redemption distribution by P.  In situation 3, P simply distributes the S stock pro rata to its shareholders in redemption of a portion of their P stock.  The issue, as stated in the ruling, is "whether, and to what extent, the fact that a corporation has conducted a portion of its business activities through a subsidiary rather than directly precludes the application of section 346(a)(2) of the Code."  1975-1 C.B. at 110.  Under former section 346, a distribution in partial redemption of the stock of a corporation is considered to be made in partial liquidation of the corporation if the distribution is on account of "the [distributing] corporation's ceasing to conduct, or consists of the assets of, a trade or business * * * [actively conducted throughout the prior 5-year period and] not acquired by the corporation within such period in a [taxable] transaction".  Former sec. 346(a) and (b)(1).  See also sec. 1.346-1(a)(2), Income Tax Regs., stating:  "An example of a distribution which will qualify as a partial liquidation

under * * * section 346(a) is a distribution resulting from a genuine contraction of the corporate business".

The revenue ruling, after noting that "[t]he business activities of a subsidiary are not generally considered to be business activities of its parent corporation", recognizes that, under a section 332 liquidation (where the carryover basis rules of section 334(b)(1) apply), "[s]ection 381, in effect integrates the past business results of the subsidiary (as represented by its earnings and profits, net operating loss carryover, etc.) with those of the parent corporation."  Rev. Rul. 75-223, 1975-1 C.B. at 110.  The revenue ruling then states:

> For most practical purposes, the parent corporation, after the liquidation of the subsidiary, is viewed as if it has always operated the business of the liquidated subsidiary.  Consequently, there is no meaningful distinction, for purposes of section 346(a)(2), between a corporation that distributes the assets of a division, or the proceeds of a sale of those assets, and a parent corporation that distributes assets of a subsidiary, or the proceeds of a sale of such assets, received from the subsidiary in a liquidation governed by sections 332 and 381.  [Id.]

Accordingly, the ruling holds that, in situations 1 and 2, "the fact that the distributions * * * were attributable to assets that were used by a subsidiary rather than directly by the parent will not prevent the distribution from qualifying as a 'genuine contraction of the corporate business' of the parent within the

meaning of section 1.346-1(a)(2) of the regulations."  Id.[10]

In Chief Counsel Memorandum (G.C.M.) 37,054 (Mar. 21, 1977),[11] the IRS Chief Counsel described the position taken in Rev. Rul. 75-223 and in G.C.M. 35,246 (Feb. 20, 1973), in which the Chief Counsel gave advance approval to the position taken in Rev. Rul. 75-223, as follows:

> Under that Ruling [Rev. Rul. 75-223] and G.C.M. 35246 a distribution by a parent corporation of the assets of a subsidiary (or the proceeds of a sale of such assets) received in a liquidation governed by Code sections 332 and 381 is to be treated no differently than a distribution by a corporation of the assets of a branch or division (or the proceeds of a sale of such assets).

---

[10]  The ruling contrasts the partial redemption distribution in situation 3 and treats it as a corporate separation governed by sec. 355 rather than as a corporate contraction qualifying as a partial liquidation within the meaning of sec. 346(a)(2).  Rev. Rul. 75-223, 1975-1 C.B. 109, 110.  Unlike situations 1 and 2, situation 3 does not involve a sec. 332 liquidation entailing a carryover of tax attributes under sec. 381.  See also Rev. Rul. 79-184, 1979-1 C.B. 143, involving a parent's sale of the stock of its wholly owned subsidiary followed by a distribution (pro rata) of the sales proceeds to the shareholders of the parent in partial redemption of their stock.  Analogizing the facts of that ruling to the facts of situation 3 of Rev. Rul. 75-223, Rev. Rul. 79-184, 1979-1 C.B. at 144 holds that "the overall transaction has the economic significance of the sale of an investment and distribution of the proceeds" and "does not qualify as a distribution in partial liquidation within the meaning of section 346(a)(2)."

[11]  Although under Treasury regulations G.C.M.s do not establish precedent (see sec. 1.6661-3(b)(2), Income Tax Regs.), they have been described as "an expression of agency policy". Taxation With Representation Fund v. IRS, 646 F.2d 666, 682 (D.C. Cir. 1981).  Moreover, the Court of Appeals for the Second Circuit (the court to which an appeal of this decision most likely would lie) has stated that, under certain circumstances, it may be proper to rely on G.C.M.s for "interpretive guidance". Morganbesser v. United States, 984 F.2d 560, 564 (2d Cir. 1993).

Respondent reaffirmed his Rev. Rul. 75-223 position in Rev. Rul. 77-376, 1977-2 C.B. 107. He also reaffirmed that position in subsequent private letter rulings.[12] See, e.g., Priv. Ltr. Rul. 2003-01-029 (Jan. 3, 2003), Priv. Ltr. Rul. 2000-04-029 (Jan. 28, 2000), and Priv. Ltr. Rul. 87-04-063 (Oct. 29, 1986), applying the principles of Rev. Rul. 75-223 in finding partial liquidation distributions under section 302(b)(4) and (e)(2).

Respondent has also reaffirmed his Rev. Rul. 75-223 position in the context of transactions other than partial liquidations. See, e.g., Priv. Ltr. Rul. 80-19-058 (Feb. 13, 1980), involving an amalgamation of a United States shareholder's Country X CFCs, which qualified as a "corporate acquisition" within the meaning of section 381. Pursuant to the amalgamation, CFC F1 contributed the stock of its subsidiary, F2, to a new CFC, Newco 1, in exchange for Newco 1 stock and debentures, the latter consideration constituting a dividend to F1 under section 356(a)(2). Newco 1 combined with several operating company CFCs, three of which were same country (Country X) subsidiaries of F1, to form Newco II. In the private letter ruling, the Commissioner

_____

[12] Private letter rulings may be cited to show the practice of the Commissioner. See Rowan Cos. v. United States, 452 U.S. 247, 261 n.17 (1981); Hanover Bank v. Commissioner, 369 U.S. 672, 686-687 (1962); Rauenhorst v. Commissioner, 119 T.C. 157, 170 n.8 (2002); Estate of Cristofani v. Commissioner, 97 T.C. 74, 84 n.5 (1991); Woods Inv. Co. v. Commissioner, 85 T.C. 274, 281 n.15 (1985).

states that "a surviving corporation carries with it all those characteristics which the merged corporation had prior to the merger * * * [including] the attribute of a predecessor corporation having engaged in a trade or business with respect to the use of its assets", even though that is not an item specifically listed in section 381(c) as carrying over to the surviving corporation.  Accordingly, the IRS ruled that the amounts treated as section 356(a)(2) dividends paid to F1 out of the earnings and profits of a party to the Newco II amalgamation which were accumulated when that party (1) was a related person to F1 within the meaning of section 954(d)(3), (2) had been created or organized under the same foreign country laws as F1, and (3) had a "substantial part" of the assets used in its trade or business located in such foreign country would not be includable in FPHCI of F1 for purposes of section 954, by reason of section 954(c)(4)(A) (now section 954(c)(3)(A)(i)), the so-called same country exception to the treatment, as FPHCI, of related party dividends or interest.  In other words, the IRS found that Newco II inherited from former operating subsidiaries of F1 collapsed into it in a transaction subject to section 381 the attribute of being "engaged in a trade or business with respect to the use of * * * [those subsidiaries'] assets".  Therefore, a portion of the Newco II dividend to F1 arising out of F1's receipt of the Newco I debentures (which become Newco II

debentures) was excluded from FPHCI by the same country exception.

### 3. The Caselaw

Respondent relies principally upon four cases in support of his argument that the H&C assets were not used in Dover UK's business before their deemed sale by Dover UK: Reese v. Commissioner, 615 F.2d 226 (5th Cir. 1980), affg. T.C. Memo. 1976-275; Azar Nut Co. v. Commissioner, 94 T.C. 455 (1990), affd. 931 F.2d 314 (5th Cir. 1991); Acro Manufacturing Co. v. Commissioner, 39 T.C. 377 (1962), affd. 334 F.2d 40 (6th Cir. 1964); and Ouderkirk v. Commissioner, T.C. Memo. 1977-120. In three of those cases (Reese, Azar Nut, and Ouderkirk) the issue is whether an individual's gain or loss on the sale of a parcel of real property is capital or ordinary.

### a. Reese v. Commissioner

In Reese, the taxpayer financed the construction of a manufacturing plant, which he intended to sell to investors who would agree to lease the building to a corporation for use in the corporation's manufacturing business. The taxpayer was the chief officer and principal shareholder of the corporation. The partially completed plant was sold at a loss to satisfy a judgment against the taxpayer. The issue was whether the loss was capital or ordinary. The taxpayer argued for ordinary loss treatment on the ground that the plant was either (1) held primarily for sale to customers in the ordinary course of his

construction business or (2) used in a trade or business, excludable, in either case, from capital asset status under what, respectively, are now paragraphs (1) and (2) of section 1221(a). The Court of Appeals for the Fifth Circuit found that (1) the taxpayer's activities in financing and acting as builder, developer, and general contractor for the construction of the plant between 1968 and 1970, when the building was sold, constituted "an isolated, non-recurring venture", which did not constitute a trade or business, and (2) the property sold was intended for use by the corporation in its manufacturing business, not by the taxpayer in his business of being a corporate executive.  Reese v. Commissioner, 615 F.2d at 231. Therefore, the Court of Appeals held that the property was not excluded from the definition of a capital asset as either property held for sale to customers in the ordinary course of business or as property used in the taxpayer's trade or business. Id.

In support of his argument that Dover UK's deemed holding of the H&C operating assets "for only a moment before the sale" did not transform those assets into assets used in Dover UK's business, respondent relies on the conclusion of the Court of Appeals in Reese that an "isolated, non-recurring venture" cannot amount to the conduct of a trade or business.  The facts before the Court of Appeals, and the question it answered, however, are

distinguishable from the facts and question before us.  In Reese, the Court of Appeals was asked to conclude (and did conclude) that the taxpayer's venture into real property construction never amounted to the conduct of a trade or business.  Here, on the deemed liquidation of H&C, Dover UK is deemed to have received the assets of what undeniably was an ongoing business.  The question is whether that business was ever conducted by Dover UK.  Reese does not answer that question.[13]

b.  Ouderkirk v. Commissioner and Azar Nut Co.
v. Commissioner

Ouderkirk v. Commissioner, T.C. Memo. 1977-120, involved an individual who, in connection with the liquidation of a corporation, received 7,700 acres of cut-over timberland and an obsolete and inefficient sawmill, both of which the taxpayer contributed to a partnership owned by him and his wife.  After refurbishment, the sawmill was placed in operation.  Over an 11-year period, approximately 80 percent of the timber processed by the sawmill was acquired from sources outside the 7,700 acres of timberland owned by the partnership.  At the end of that period, the partnership sold the sawmill at a loss (which it reported,

---

[13]  The position of the Court of Appeals for the Fifth Circuit in Reese v. Commissioner, 615 F.2d 226 (5th Cir. 1980), affg. T.C. Memo. 1976-275, that a single nonrecurring venture ordinarily will not be considered a trade or business, has been referred to as the "one-bite" rule, a rule that has been specifically rejected by this Court.  See Cottle v. Commissioner, 89 T.C. 467, 488 (1987); Morley v. Commissioner, 87 T.C. 1206, 1211 (1986); S&H, Inc. v. Commissioner, 78 T.C. 234, 244 (1982).

and passed through to the taxpayer and his wife, as an ordinary loss from the sale of property used in a trade or business) and sold the timberland at a gain (which it reported, and passed through to the taxpayer and his wife, as a capital gain from the sale of an investment asset). The Commissioner challenged the characterization of the timberland gain as capital gain, arguing that the timberland was not a capital asset because it was property used in the partnership's sawmill and lumber business. We rejected the Commissioner's position and sustained the taxpayer's argument that the property was investment property in the hands of the partnership. In reaching that conclusion, we noted that "[t]he incidental use of this 7,700-acre tract in connection with * * * [the] cutting of scattered timber did not convert the tract from investment property to real property used in the [partnership's] sawmill business within the meaning of section 1231." Id.

In Ouderkirk, as in Reese v. Commissioner, supra, the issue was whether the property in question had a business connection sufficient to require its exclusion from the definition of a capital asset (in Ouderkirk, as property used in a trade or business, and, in Reese, as inventory type property). Therefore, Ouderkirk, like Reese, is distinguishable from this case, where the issue is whether assets undeniably used in a trade or business were used in a trade or business conducted by Dover UK.

In Azar Nut Co. v. Commissioner, 94 T.C. 455 (1990), the taxpayer, in connection with its termination of an individual's employment, purchased the employee's residence at an appraised fair market value pursuant to the terms of an employment agreement. The taxpayer immediately listed the house for sale at the purchase price paid to its former employee but eventually incurred a substantial loss on the sale, some 22 months later. Because the house was never held for rental by the taxpayer or used or intended for use in the taxpayer's business, we held that it was not exempt from capital asset status as property used in a trade or business and that the loss was, therefore, capital loss.[14] Id. at 463-464. In Azar Nut, as in Ouderkirk v. Commissioner, supra, and Reese v. Commissioner, supra, capital asset status was based upon insufficient (or no) business use, not, as respondent argues in this case, upon the identity of the user of assets undeniably used in a trade or business.

---

[14] The taxpayer in Azar Nut Co. v. Commissioner, 94 T.C. 455 (1990), affd. 931 F.2d 314 (5th Cir. 1991), argued that the house was not a capital asset because its purchase from the terminated employee and subsequent resale were connected with the taxpayer's business; i.e., the transactions arose out of a business necessity, not an investment purpose. We rejected that argument on the basis of Ark. Best Corp. v. Commissioner, 485 U.S. 212 (1988). That case rejected the business connection-business motivation rationale of such cases as Commissioner v. Bagley & Sewall Co., 221 F.2d 944 (2d Cir. 1955)(relied upon by the taxpayer in Azar Nut), affg. 20 T.C. 983 (1953), and held that property constitutes a capital asset unless it is excluded from capital asset status by one of the specific statutory exclusions listed in what is now sec. 1221(a). Ark. Best Corp. v. Commissioner, supra at 223.

### c.  Acro Manufacturing Co. v. Commissioner

In Acro Manufacturing Co. v. Commissioner, 39 T.C. 377 (1962), the taxpayer, a manufacturer of precision switches and thermostatic controls, acquired in a tax-free reorganization the stock of Universal Button Company (Button), a manufacturer of metal buttons for work clothes.  Some 3 months later, the taxpayer received an offer to buy all of the stock or assets of Button.  Because the taxpayer wished to avoid capital loss on a sale of the Button stock, the parties to the transaction negotiated an agreement for the sale of Button's assets whereby the taxpayer would liquidate Button and sell its assets to the purchaser.  Pursuant to that agreement, Button adopted a plan of complete liquidation.  On the following day, less than 7 months after its acquisition by the taxpayer, Button underwent a tax-free section 332 liquidation, and its assets were sold by the taxpayer to the purchaser for cash plus the purchaser's assumption of the liabilities relating to the business formerly carried on by Button.  Button's business continued uninterrupted during the foregoing ownership transfers.

The taxpayer argued that the non-capital asset character of the assets in Button's hands should carry over to the taxpayer after the section 332 liquidation because, under the section 1223(2) holding period "tacking" provisions, the taxpayer is

deemed to have held or owned those assets while they were used by Button in the conduct of its business. Acro Manufacturing Co. v. Commissioner, supra at 383. Respondent, while admitting that the assets distributed to the taxpayer in connection with the section 332 liquidation of Button were not capital assets in Button's hands, argued that, because the former Button assets were never used in the taxpayer's business, they constituted capital assets in the taxpayer's hands. Id. at 384.

We rejected the taxpayer's arguments and held that the character of the Button assets did not automatically carry over to the taxpayer; rather, we stated that our concern was with the "tax nature" of those assets in the taxpayer's hands. We asked: "Were the assets acquired or used in connection with a business of * * * [the taxpayer]?" Id. We found that the taxpayer "neither acquired nor used the Button assets in its business, neither did * * * [the taxpayer] enter into the button business." Id. at 386. In connection with those findings, we rejected the taxpayer's argument that it used the former button assets in its business "for a short time", between the same-day liquidation of Button and sale of its assets, stating that "ownership for such a minimal, transitory period is insufficient to establish 'use' of the distributed assets in * * * [the taxpayer's] business or to place * * * [the taxpayer] in the button business." Id. at 384. As a result, we found that the former Button assets were capital

assets in the taxpayer's hands and the taxpayer's sale of those assets resulted in a capital loss.  Id. at 386.

Both the result in Acro Manufacturing Co. v. Commissioner, supra, and our reasoning in reaching that result were affirmed by the Court of Appeals for the Sixth Circuit.  Acro Manufacturing Co. v. Commissioner, 334 F.2d 40 (6th Cir. 1964).  In affirming our decision that the taxpayer's "minimal, transitory" period of actual ownership of assets whose character was non-capital in Button's hands was insufficient to establish their character as non-capital assets in the taxpayer's hands, the Court of Appeals observed that it was "not advised of any showing by the taxpayer's corporate records" that the taxpayer did, in fact, operate the button business for any period of time.  Id. at 44.[15]

While the facts of Acro Manufacturing Co. v. Commissioner, 39 T.C. 377 (1962), involve an actual, rather than a deemed, section 332 liquidation, we do not believe that that is a consequential difference.  Because the period between the deemed distribution in liquidation of H&C's assets and the deemed sale of those assets can be described as a "minimal, transitory

---

[15] Respondent points out that Dover UK failed to report any income from H&C's business on its 1997 return filed with the United Kingdom Inland Revenue.  While we deem that fact irrelevant, we note that Dover UK's United Kingdom tax reporting position is justified by the fact that H&C's disregarded entity election resulted in a deemed liquidation of H&C effective for United States, but not United Kingdom, tax purposes.

period", we conclude that the facts before us are, as pertinent, not distinguishable from the facts in Acro Manufacturing Co.

C.  Analysis and Application of Authorities

Respondent specifically acknowledges that, for tax purposes, H&C's disregarded entity election constituted a deemed section 332 liquidation of H&C into Dover UK, whereby H&C became a branch or division of Dover UK.  Respondent refers to the disregarded entity election as a "check-the-box liquidation" and states that there is no difference between it and an actual section 332 liquidation.

Accordingly, the principal question before us is whether, attendant to a section 332 liquidation, the transferee parent corporation succeeds to the business history of its liquidated subsidiary with the result that the subsidiary's assets used in its trade or business constitute assets used in the parent's trade or business upon receipt of those assets by the parent.

Because Dover UK's disregarded entity election is characterized as an actual liquidation of H&C for income tax purposes, among the undisputed tax consequences are the following: (1) Dover UK recognized neither gain nor loss on its deemed receipt of H&C's assets, see sec. 332(a); (2) it succeeded to H&C's basis in those assets, see sec. 334(b); and (3) it would add H&C's holding period to its own (deemed) holding period in those assets, see sec. 1223(2).  Moreover, the deemed-received assets did not constitute a single, mass asset with a unitary

holding period, but comprised the numerous classes of both tangible and intangible property necessary to constitute a going elevator installation and service business (e.g., tools, spare parts, fixtures, and accounts receivable).  Each item deemed received by Dover UK came with a distinct, carryover basis and an existing holding period.  Cf. <u>Williams v. McGowan</u>, 152 F.2d 570, 572 (2d Cir. 1945) (capital asset status of the assets of a business sold shortly after the partnership conducting the business was terminated must be determined on an asset by asset basis).

Agreeing, as he must, to the foregoing description of the tax consequences resulting to Dover UK from its deemed receipt of H&C's assets, respondent, nevertheless, argues:  "Dover UK must * * * use, or hold for use, such assets for the requisite period of time in its trade or business before Dover UK is allowed to exclude from FPHCI the gain from the [deemed] sale of those assets."  Respondent refuses to attribute H&C's business history to Dover UK:

> Dover UK had a separate identity from H&C and the
> business of H&C (installing and servicing elevators)
> was not the business of Dover UK (a holding company).
> In addition, Dover UK never intended to use the assets
> in an elevator business.  It acquired the assets for
> the purpose of selling those assets and avoiding FPHCI.

The arguments of the parties concerning whether we must deem Dover UK to have succeeded to H&C's business history center on section 381, which provides that the acquiring corporation in a

section 332 liquidation succeeds to the various tax attributes of the distributing corporation described in section 381(c).[16] While section 381(c) does not list among the carryover attributes the distributing corporation's business history, we agree with petitioner that respondent's denial that Dover UK succeeded to H&C's business history is inconsistent with his position in Rev. Rul. 75-223, 1975-1 C.B. 109, Rev. Rul. 77-376, 1977-2 C.B. 107, G.C.M. 37,054 (Mar. 21, 1977), and a number of private letter rulings (discussed supra section V.B.). Respondent argues that the conclusion reached in Rev. Rul. 75-223 (and reaffirmed in subsequent published and private rulings) should be limited to section 346. Respondent further states that "petitioner should not be allowed to argue that the tax attributes of a subsidiary are carried over to the parent in all cases under * * * [section 381]." We disagree.

The crucial finding in all of the rulings discussed supra section V.B., is that, in any corporate amalgamation involving the attribute carryover rules of section 381, the surviving or recipient corporation is viewed as if it had always conducted the business of the formerly separate corporation(s) whose assets are

---

[16] Among the tax attributes of the transferor subsidiary that carry over to the transferee parent, pursuant to sec. 381(c), are net operating loss and capital loss carryovers, earnings and profits, and the subsidiary's overall method of accounting, method of computing inventories, and method of computing the allowance for depreciation.

acquired by the surviving corporation.  See, e.g., Rev. Rul. 75-223, 1975-1 C.B. at 110.  The Chief Counsel has stated unequivocally that the impact of that finding on a distribution by a corporation of assets received by it in a section 332 liquidation is that the distribution "is to be treated no differently than a distribution by a corporation of the assets of a branch or division".  G.C.M. 37,054 (Mar. 21, 1977).  Although that principle has been applied by the Commissioner in specific contexts (generally, in connection with former section 346 or section 302(e) partial liquidations), it has been stated as a principle of law applicable in any case involving a corporate combination to which section 381 applies.  That includes a section 332 liquidation.  Moreover, if a parent corporation's distribution to its shareholders of the operating  assets of a former subsidiary, immediately after receiving those assets in a section 332 liquidation of the subsidiary, qualifies as "a genuine contraction of the * * * [parent corporation's] business" for purposes of section 1.346-1(a)(2), Income Tax Regs., we fail to see any basis for not applying the same rationale to the parent's sale of the liquidated subsidiary's assets, so that the sale is treated as a sale of assets used in the parent corporation's business for purposes of section 1.954-2(e)(3)(ii) through (iv), Income Tax Regs.

In <u>Rauenhorst v. Commissioner</u>, 119 T.C. 157 (2002), we refused "to allow * * * [IRS] counsel to argue the legal principles of * * * opinions against the principles and public guidance articulated in the Commissioner's currently outstanding revenue rulings." <u>Id.</u> at 170-171. Consistent with our holding in <u>Rauenhorst</u>, we refuse to allow respondent to argue the legal principles of <u>Acro Manufacturing Co. v. Commissioner</u>, 39 T.C. 377 (1962), against the principles subsequently articulated in Rev. Rul. 75-223, 1975-2 C.B. 109, Rev. Rul. 77-376, 1977-2 C.B. 107, and G.C.M. 37,054 (Mar. 21, 1977). We therefore consider respondent to have conceded that, as a direct result of a section 332 liquidation of an operating subsidiary, the surviving parent corporation is considered as having been engaged in the liquidated subsidiary's preliquidation trade or business, with the result that the assets of that trade or business are deemed assets used in the surviving parent's trade or business at the time of receipt. See <u>Rauenhorst v. Commissioner</u>, <u>supra</u> at 170-171, 173. As stated by respondent on brief, pursuant to section 301.7701-3(g)(1)(ii) and (2)(i), Proced. & Admin. Regs., "there is no difference between a check-the-box liquidation and an actual liquidation." Therefore, notwithstanding our holding in <u>Acro Manufacturing Co. v. Commissioner</u>, <u>supra</u>,[17] we conclude that

---

[17] We need not revisit our decision in that case at this time.

respondent has conceded that Dover UK's deemed sale of the H&C assets immediately after the check-the-box liquidation of H&C constituted a sale of property used in Dover UK's business within the meaning of section 1.954-2(e)(3)(ii) through (iv), Income Tax Regs.[18]  That result is consistent with the conclusion of the Court of Appeals for the Second Circuit in Williams v. McGowan, 152 F.2d 570 (2d Cir. 1945), that depreciable property and inventory that had been part of a business sold shortly after the partnership conducting the business was terminated retain their status as non-capital assets in the hands of the individual seller.

Respondent's acknowledgment that the business history and activities of a subsidiary carry over to its parent in connection with a section 332 liquidation of the subsidiary is also reflected in section 301.7701-2(a), Proced. & Admin. Regs., which provides that "if the entity is disregarded, its activities are treated in the same manner as a sole proprietorship, branch, or division of the owner".  In the context of a business organization, a "branch" is defined as a "division of a business", and a "division" as an "area of * * * corporate

---

[18]  Because H&C's use of its assets was entirely business related, that use almost certainly covered more than one-half of the various periods that, taking into account sec. 1223(2), Dover UK is deemed to have held those assets.  Therefore, that use is deemed to be the use for which those assets were held for purposes of sec. 1.954-2(a)(3), Income Tax Regs.

activity organized as an administrative or functional unit."
American Heritage Dictionary (4th ed. 2000); see also Black's Law
Dictionary 188, 479 (6th ed. 1990) (defining a "branch", in
relevant part, as a "[d]ivision, office, or other unit of
business located at a different location from main office or
headquarters", and a "division" as an "[o]perating or
administrative unit of * * * business").  Thus, the plainly
understood import of the cited regulation's use of the terms
"branch" and "division" to describe the impact of the deemed
section 332 liquidation resulting from a disregarded entity
election with respect to an operating subsidiary (particularly in
light of respondent's ruling position, as set forth supra) is
that the activities of the business operation indirectly owned by
the parent through its former subsidiary become the activities of
a functional or operating business unit directly owned and
conducted by the parent.[19]  It follows from the language of the
regulation that the assets used in the business of the (deemed)
liquidated subsidiary retain their status as assets used in the

---

[19]  Sec. 301.7701-2(a), Proced. & Admin. Regs., does not
specify a minimum period of time after which a disregarded entity
election results in branch or division status for the disregarded
entity.  Rather, the disregarded entity is deemed a branch or
division of the owner upon the effective date of the election, a
point that is conceded by respondent on brief.  Nor do the check-
the-box regulations require that the taxpayer have a business
purpose for such an election or, indeed, for any election under
those regulations.  Such elections are specifically authorized
"for federal tax purposes".  Sec. 301.7701-3(a), Proced. & Admin.
Regs.

same business by the (deemed) branch or division of the parent.

We interpret our statement in Acro Manufacturing Co. v. Commissioner, 39 T.C. at 386, that the taxpayer "neither acquired nor used the Button assets in its business" as tantamount to a statement that the Button business never became an operating branch or division of the taxpayer. Therefore, the Secretary and the Commissioner, in effect, rejected our position in that case by issuing section 301.7701-2(a), Proced. & Admin. Regs., as well as Rev. Rul. 75-223, Rev. Rul. 77-376, and G.C.M. 37,054.[20]

Finally, we note that, consistent with his admonition in the preamble to the final check-the-box regulations, T.D. 8697, 1997-1 C.B. at 216, that "Treasury and the IRS will continue to monitor carefully the uses of partnerships [and, by extension, disregarded entities] in the international context and will take appropriate action when * * * [such entities] are used to achieve results that are inconsistent with the policies and rules of

---

[20] Because of Rev. Rul. 75-223, 1975-2 C.B. 109, and its progeny, petitioner's interpretation of sec. 301.7701-2(a), Proced. & Admin. Regs., as requiring the post-(deemed) liquidation business activities of H&C to be considered business activities of Dover UK immediately following the deemed liquidation of H&C is certainly a plausible interpretation of that regulation. As we stated in Corn Belt Hatcheries of Ark., Inc. v. Commissioner, 52 T.C. 636, 639 (1969), in sustaining the taxpayer's plausible interpretation of an ambiguous ruling, "[t]axpayers are already burdened with an incredibly long and complicated tax law. We see no reason to add to this burden by requiring them anticipatorily to interpret ambiguities in respondent's rulings to conform to his subsequent clarifications".

particular Code provisions", respondent was, of course, free to amend his regulations to require a minimum period of continuous operation of a foreign disregarded entity's business, prior to the disposition of that business, as a condition precedent to treating the owner as having been engaged in the trade or business for purposes of characterizing the gain or loss.  But, in the absence of respondent's exercise of that authority, we must apply the regulation as written.  See Exxon Corp. v. United States, 88 F.3d 968, 974-975 (Fed. Cir. 1996); Woods Inv. Co. v. Commissioner, 85 T.C. 274, 282 (1985); Henry C. Beck Builders, Inc. v. Commissioner, 41 T.C. 616, 628 (1964).  As we observed in sustaining the application of a provision of the consolidated return regulations, the fact that the regulation gives rise to a perceived abuse is "a problem of respondent's own making", a problem that respondent has allowed to persist by choosing "not to amend the regulations to correct the problem."  CSI Hydrostatic Testers, Inc. v. Commissioner, 103 T.C. 398, 411 (1994), affd. 62 F.3d 136 (5th Cir. 1995).[21]

---

[21]  Respondent did include an allegedly corrective amendment as part of proposed regulations issued on Nov. 29, 1999.  See REG-110385-99, 64 Fed. Reg. 66591 (Nov. 29, 1999).  The proposed regulations contained a special rule for foreign disregarded entities used in a so-called extraordinary transaction, one of which constitutes the sale of a 10-percent or greater interest in such an entity within 12 months of the entity's change in classification from association taxable as a corporation to disregarded entity.  Under those circumstances, the proposed regulations provided that the disregarded entity "will instead be
(continued...)

VI. <u>Validity of Section 1.954-2(e)(3), Income Tax Regs.</u>

Because we find that Dover UK's deemed sale of the H&C assets constituted a sale of assets used in Dover UK's business within the meaning of section 1.954-2(e)(3)(ii) through (iv), Income Tax Regs., we do not address petitioner's argument that section 1.954-2(e)(3), Income Tax Regs., is invalid.

VII. <u>Conclusion</u>

Dover UK's gain on the deemed sale of the H&C assets does not constitute FPHCI to petitioner pursuant to section 954(c)(1)(B)(iii).

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[21](...continued)
classified as an association taxable as a corporation".  Sec. 301.7701-3(h)(1), Proposed Proced. & Admin. Regs., 64 Fed. Reg. 66594 (Nov. 29, 1999).  (We assume that the consequence of that approach would be that a CFC's sale of the stock of the disregarded entity would be treated as a sale of property described in sec. 954(c)(1)(B)(i), rather than as a sale of property described in sec. 954(c)(1)(B)(iii), which is respondent's approach in this case, under the existing regulations.)  After receiving a number of unfavorable comments, respondent, on June 26, 2003, issued Notice 2003-46, 2003-28 I.R.B. 53, announcing his intention to withdraw the so-called extraordinary transaction rule of the proposed regulations. Formal withdrawal of that portion of the proposed regulations occurred on Oct. 22, 2003.  See REG-1110385-99, 68 Fed. Reg. 60305 (Oct. 22, 2003).